706 So.2d 1328 (1997)
David Allen GORE, Appellant,
v.
STATE of Florida, Appellee.
No. 80916.
Supreme Court of Florida.
July 17, 1997.
Rehearing Denied March 5, 1998.
*1330 Richard L. Jorandby, Public Defender; and Gary Caldwell and Richard B. Greene, Assistant Public Defenders, Fifteenth Judicial Circuit, West Palm Beach, for Appellant.
Robert A. Butterworth, Attorney General and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, for Appellee.
PER CURIAM.
We have on appeal the sentence of the trial court imposing the death penalty upon David *1331 Allen Gore following resentencing.[1] We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The circumstances of the murder are as follows. On July 26, 1983, Gore and his cousin Freddy Waterfield picked up teenagers Lynn Elliott and Regan Martin, who were hitchhiking. Soon after, Gore took a gun out of the glove compartment and handcuffed the two girls while Waterfield drove to Gore's parents' house. Once there, Gore bound each of the girls and placed them in separate bedrooms. Regan Martin testified that Gore cut off her clothes and forced her to perform oral sex on him while he threatened to kill her, and that Gore kept going back and forth between the two rooms. At one point when Gore was out of the room, Martin heard gunshots from outside. When Gore returned he placed her in a closet and then the attic and threatened to kill her if she tried anything. Soon after, Gore surrendered to the police and Martin was rescued. Elliott's nude body was found in the trunk of Gore's car.
Michael Rock, a teenager riding his bike by Gore's house on the day in question, testified that he saw Gore and a naked woman (Lynn Elliott) running up the driveway toward the road. Rock watched as Gore caught up with Elliott and dragged her back toward the house. He then saw Gore throw Elliott down and shoot her. Elliott had been shot twice, once in the back of the head and once in the jaw.
The jury recommended a sentence of death by a vote of twelve to zero. The trial court found the following six aggravators were established beyond a reasonable doubt:
(1) The capital felony was committed by a person under sentence of imprisonment. Gore was on parole after being convicted and sentenced for trespass of a conveyance while armed.
(2) The defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to a person. The trial court found that the facts of the aforementioned trespass conviction involved the threat of violence to a person. The court further found that Gore's contemporaneous convictions for kidnapping and sexual battery also satisfied this aggravator.
(3) The crime was committed while the defendant was engaged in the commission of a sexual battery and kidnapping.
(4) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. The trial court found that Elliott was in the process of escaping and was killed for the dominant or sole motive to prevent her from identifying Gore because that would lead to his arrest.
(5) The capital felony was especially heinous, atrocious, or cruel (HAC). The trial court relied on evidence that Elliott was abducted and handcuffed at gun point, brought to the Gores' residence, and then tightly bound before being sexually assaulted. The court also found that Elliott attempted to flee but Gore caught up with her and dragged her back as she fought to free herself before finally throwing her to the ground and shooting her.
(6) The murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). The trial court relied on evidence that Gore participated in a detailed plan to kidnap a young girl using a gun, handcuffs, and rope, to transport her to his residence, commit sexual battery, terrorize and then murder her. He also threatened to kill Regan Martin and told her he was "going to do it anyway."
The trial court found no statutory mitigation. It found the following nonstatutory mitigating circumstances: (1) Gore's exemplary conduct while in prison, his past conduct as a model prisoner, his capacity to be *1332 one in the future, and his ability to live in prison without being a threat or danger to others; (2) Gore's impoverished childhood; (3) Gore's exemplary conduct during the resentencing proceeding; (4) Gore's depression at the time of the offense; and (5) Gore's love for his children and his separation from them. Finding that the mitigating circumstances were substantially outweighed by the aggravating circumstances, the trial court sentenced Gore to death.
Gore raises sixteen issues in this appeal. We find that nine merit consideration. We reject the remaining seven without discussion.[2] First, he contends that the trial court erred during jury selection in denying his challenges for cause to eight members of the venire. Of those eight, three ultimately served on the jury.[3] A trial court has great discretion when deciding whether to grant or deny a challenge for cause based on juror incompetency. Pentecost v. State, 545 So.2d 861 (Fla.1989). The decision to deny a challenge for cause will be upheld on appeal if there is support in the record for the decision. Johnson v. State, 660 So.2d 637, 644 (Fla.1995), cert. denied, 517 U.S. 1159, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996).
We conclude that the trial court did not abuse its discretion in declining to excuse the challenged venire members.[4] We have carefully examined the voir dire of each of these jurors. Although they expressed certain biases and prejudices, each of them also stated that they could set aside their personal views and follow the law in light of the evidence presented. Penn v. State, 574 So.2d 1079 (Fla.1991); Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984). The trial court was in a better position to assess the credibility of these venire members. Consequently, we will not substitute our judgment for that of the trial court.
Gore's second argument is that the trial court through multiple errors permitted the State to mislead the jury as to his eligibility for parole. Specifically, Gore asserts that in light of his numerous other life sentences,[5] he could not have been considered for parole for at least fifty years if given a life sentence. According to Gore, the jury was misled into believing that Gore was subject to parole either immediately on some of these offenses or at most within fifteen years. As part of this argument, Gore contends that it was error to deny his request to omit possibility of parole after twenty-five years from the life sentence instruction. We disagree. The jury was correctly instructed that a life sentence for the murder of Lynn Elliott included eligibility for parole after twenty-five years. § 775.082(1), Fla. Stat. (1983).[6] It would have been error for the trial court to instruct the jury otherwise.
*1333 Also in connection with this argument, Gore posits that the trial court erred in its responses to two questions issued by the jury during deliberations. The first question asked whether, if given a life sentence, Gore would receive credit for the ten years he had already served, to which the court instructed the jury that he would. However, even defense counsel conceded this point at trial. The jury's second question asked if and when parole could occur on these other life sentences. The court instructed the jury to rely on their recollection of the evidence that had been presented. This was not error. The record shows that in its cross-examination of former prosecutor Robert Stone,[7] the State elicited testimony that none of Gore's life sentences contained a minimum mandatory sentence.[8] Defense counsel did not object to the line of questioning; thus any objection was waived. We also note that defense counsel was free to argue that as a practical matter Gore would spend his life in prison.
Because Gore points out that error can occur even where there is no actual misstatement of the law, we also note that this case is distinguishable from Hitchcock v. State, 673 So.2d 859, 863 (Fla.1996). In Hitchcock, the State argued in a resentencing proceeding that the defendant would be eligible for parole after twenty-five years if given a life sentence. We held this argument to be improper and unfairly prejudicial because the resentencing occurred so close in time to the expiration of the twenty-five-year period. In contrast, the State in the present case did not make any such argument, nor was Gore close to meeting the expiration of the twenty-five-year minimum mandatory.
Gore's third argument is that the trial court erred in finding that his prior conviction for armed trespass of a conveyance constituted a felony involving the use or threat of violence under section 921.141(5)(b), Florida Statutes (1991). He argues that neither the facts of the offense nor its legal elements satisfied the requirements for finding this aggravating circumstance. In Johnson v. State, 465 So.2d 499 (Fla.1985), we held that the offense of burglary is not per se a crime involving violence or threat of violence. We continued:
[W]hether a previous conviction of burglary constitutes a felony involving violence under section 921.141(5)(b), Florida Statutes (1981), depends on the facts of the previous crime. Those facts may be established by documentary evidence, including the charging or conviction documents, or by testimony, or by a combination of both.
Id. at 505. The same can be said of armed trespass.[9] While the crime of armed trespass is not per se a crime involving the use or threat of violence, documentary evidence and/or testimony may be introduced to establish that the circumstances surrounding a defendant's prior crime of armed trespass satisfy the requirements of this aggravating factor.
In Johnson, we concluded that it was error to instruct the jury that burglary is a felony involving the use or threat of violence for purposes of section 921.141(5)(b) without making it clear that the circumstances surrounding the particular burglary are dispositive. Id. In the instant case, however, the trial court properly instructed the jury that trespass of a conveyance while armed may or may not be a felony involving the use or threat of violence to another person, depending on the circumstances of that offense. The evidence adduced at trial supports the finding that the offense involved the threat of violence. Testimony concerning the armed trespass offense established that Gore was found crouching behind the front seat of a woman's car with a loaded gun and a police scanner. The woman, who discovered Gore upon returning to her car but before getting in, summoned a police officer and Gore was apprehended. It is clear that at a minimum, *1334 the woman was under a threat of violence. We have held that the lack of any actual violence or harm to the intended victim is irrelevant for purposes of this aggravator. Johnston v. State, 497 So.2d 863 (Fla.1986). Thus we find no error.
Fourth, Gore argues that the trial court committed error in giving certain jury instructions and refusing to give others. In connection with this argument, he contends that the HAC and CCP instructions were unconstitutionally vague, that the trial court erred in refusing to instruct the jury on the prohibition against doubling of aggravators when they are based on the same circumstances of the crime, and that the trial court erred in refusing to instruct the jury regarding specific nonstatutory mitigation.
The State acknowledged that the HAC instruction that was then set forth in the Florida Standard Jury Instructions in Criminal Cases had been declared unconstitutional in Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). As a consequence, the State suggested an expanded HAC instruction. Defense counsel objected to this expanded instruction but declined the trial court's request to explain how the instruction could be made constitutionally adequate. Because the instruction as given was virtually identical to the instruction we upheld in Hall v. State, 614 So.2d 473, 478 (Fla.1993), we find no error on this point.
Even though the case was tried prior to this Court's decision in Jackson v. State, 648 So.2d 85 (Fla.1994), the State also requested an expanded CCP instruction. Defense counsel objected to the expanded instruction but once again declined to explain how the instruction could be changed to meet his objection. The CCP instruction ultimately given[10] incorporated some but not all of the provisions of the CCP instruction suggested in Jackson or the current standard criminal jury instruction on CCP. Assuming, without deciding, that the CCP instruction as given was inadequate, we are convinced that any error in the instruction was harmless beyond a reasonable doubt in light of the overwhelming evidence of CCP as well as the other circumstances of the case.
Gore's argument regarding the doubling instruction was not properly preserved for review. At trial, Gore's argument in favor of the doubling instruction was that the prior violent felony and under sentence of imprisonment aggravators should be merged. However, on appeal he grounds his argument for the doubling instruction on two different aggravators; namely, the CCP and avoid arrest factors. In any event, we find no error because the avoid arrest and CCP aggravators were based on different aspects of the crime. See Stein v. State, 632 So.2d 1361, 1366 (Fla.1994) (finding no improper doubling where avoid arrest aggravator focused on motive for the murder and CCP focused on manner).
We also reject Gore's argument that the trial court erred in refusing to instruct the jury regarding specific nonstatutory mitigation such as Gore's background and deprived childhood. The trial court instructed the jury that they could consider as mitigation any evidence that went to the defendant's character or record and any other circumstances of the offense. That is all that was required. Robinson v. State, 574 So.2d 108, 111 (Fla.1991). Gore's counsel was free to argue specific nonstatutory mitigation for the jury to consider.
Fifth, Gore contends that the trial court erred in finding that the avoid arrest, CCP, and HAC aggravators had been established. We disagree. With respect to the avoiding lawful arrest aggravator where the victim is not a police officer, we have required strong proof of the defendant's motive, and it must be clearly shown that the dominant or only motive for the murder was the elimination of the witness. Perry v. State, 522 So.2d 817, 820 (Fla.1988). In this case, the trial court found and the evidence established that Elliott was attempting to escape from Gore when he dragged her back *1335 toward the house and shot her. These circumstances support the finding that the dominant motive for killing Elliott was to avoid arrest by eliminating a witness. See Swafford v. State, 533 So.2d 270, 276 (Fla.1988); Harvey v. State, 529 So.2d 1083, 1087 (Fla. 1988); Harich v. State, 437 So.2d 1082 (Fla. 1983).
As to the CCP finding, the facts of this case clearly support this aggravator. The evidence showed that Gore had planned in advance to both kidnap and kill Elliott and Martin. Gore repeatedly threatened to kill the two girls throughout the ordeal. He told Regan Martin that he was "going to do it anyway" as he was sexually assaulting her, and this occurred before Elliott was killed. That statement illustrates the heightened degree of premeditation necessary to sustain the CCP aggravator. The fact that the actual murder may have taken place earlier than Gore had planned it does not change this result.
The evidence also established beyond a reasonable doubt that the murder was heinous, atrocious, or cruel. Although Elliott's death by gunshot was most likely instantaneous, we have held that the actions of the defendant preceding the actual killing are relevant to this aggravator. Swafford, 533 So.2d at 277; see also Smith v. State, 424 So.2d 726, 733 (Fla.1982). We have also held that the fear and emotional strain of the victim from the events preceding the killing may contribute to its heinous nature. Swafford, 533 So.2d at 277 (citations omitted). Here, there is little doubt that Elliott experienced terror from the moment Gore took the gun from the vehicle's glove compartment. She had been abducted, handcuffed, transported to a remote place, tightly bound, and sexually battered, all under threat of death. Her escape attempt ended in vain with Gore dragging her back toward the house and finally shooting her.
Sixth, Gore claims that the State violated its agreements with the defense by eliciting certain testimony from former prosecutor Robert Stone. Some background is required to understand this argument. Gore and the State entered into a written agreement under which he would plead guilty to first-degree murder for three other deaths in exchange for the State's assurance that it would not seek the death penalty for those crimes. The State also agreed that the convictions would not be used against Gore in any other proceedings, including the instant case, and that no information revealed by Gore to law enforcement officers after July 27, 1983, would be used against him. As part of the plea bargain, Gore also agreed to testify truthfully against his cousin Freddy Waterfield regarding his part in the crimes involving the victim in this case. Gore gave a deposition fully implicating Waterfield in these crimes. However, in the middle of Waterfield's trial, Gore's attorney informed prosecutors that Gore's trial testimony would place much less blame on Waterfield. Therefore, the State did not call Gore as a witness. Waterfield was ultimately convicted of manslaughter and sentenced to fifteen years. Subsequently, the original plea agreement was reaffirmed as part of a new agreement under which Gore agreed to plead guilty to two additional murders.
In the instant case, the defense was attempting to establish that Gore and Waterfield were equally culpable in the crimes, so that by being made eligible for the death penalty when Waterfield had been convicted of manslaughter, Gore was the subject of disparate treatment. Part of the defense's cross-examination of the State's witnesses was directed to this end. Also, in its opening argument, defense counsel quoted a statement made by Stone during his opening argument in Freddy Waterfield's trial that Waterfield was just as guilty as Gore. The State in turn presented Stone's testimony to explain that the reason Waterfield was ultimately convicted of manslaughter was because Gore had backed out of his plea agreement, leaving the State without the evidence it needed to secure a first-degree murder conviction against Waterfield, and not because Waterfield was receiving more lenient treatment for the same level of culpability.
We conclude that the trial court did not err in permitting this testimony. Significantly, there was no mention of the plea agreements or the other five murders. *1336 Moreover, Gore opened the door to this testimony by suggesting that the death penalty would be unfair in light of Waterfield's manslaughter conviction. See Wuornos v. State, 644 So.2d 1000, 1009-1010 (Fla.1994) ("Once the defense argues the existence of mitigators, the State has a right to rebut through any means permitted by the rules of evidence, and the defense will not be heard to complain otherwise.") (footnote omitted), cert. denied, 514 U.S. 1069, 115 S.Ct. 1705, 131 L.Ed.2d 566 (1995). To the extent it could be said that the State breached the condition of the plea agreements, any error in admitting Stone's testimony was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
We agree with Gore's seventh claim that the court erred in permitting a police officer to express the opinion that Gore had lied to him with respect to a particular fact. Capehart v. State, 583 So.2d 1009 (Fla.1991). However, we find this error to be harmless beyond a reasonable doubt. DiGuilio.
Gore's eighth argument is that it was improper for Judge Vaughn, a county court judge, to preside over Gore's capital sentencing proceeding. Gore asserts that the temporary assignment order authorizing Judge Vaughn to preside over the sentencing proceeding exceeded permissible time limits under Payret v. Adams, 500 So.2d 136 (Fla. 1986). However, this case is distinguishable from Payret, which involved successive assignments of a county judge totaling five years and wherein the county judge was the de facto circuit judge for a specially created district. Further, in Wild v. Dozier, 672 So.2d 16, 19 (Fla.1996), we stated that whether a judicial assignment is a proper "temporary" assignment is not merely a function of the duration of an individual assignment. Other factors to be considered include the successive nature of the assignment, the types of cases covered by the assignment, and the practical effect of the assignment on circuit court jurisdiction over a particular type of case. Id.
The record in this case indicates that Judge Vaughn received a temporary assignment to hear emergency matters in the Juvenile Division, HRS and URESA filings in the Family Relations Division, and all matters presented to him in the Criminal Division from January 1 to June 30, 1992. By separate order he also was assigned to hear domestic violence ex parte injunctions for protection cases on weekends and holidays and during the absence of the judge regularly assigned to domestic violence cases. In April of that same year he was assigned to the instant case following Judge Wild's disqualification. Judge Vaughn then received a second six-month assignment to hear the same types of matters. There is no indication that Judge Vaughn's county court duties were suspended. We therefore conclude that the two successive six-month assignments were permissible. See Crusoe v. Rowls, 472 So.2d 1163 (Fla.1985) (upholding successive assignments totaling two and a half years).
Finally, we reject the argument that Gore's resentencing violated his constitutional right to a speedy trial. See Hitchcock, 673 So.2d at 863 (rejecting argument that length of time case took since murder, which occurred in 1978, was a violation of defendant's constitutional rights).
The sentence of the trial court imposing the death penalty on David Allen Gore is affirmed.
It is so ordered.
OVERTON, GRIMES, HARDING and WELLS, JJ., concur.
SHAW, J., dissents with an opinion, in which ANSTEAD, J., concurs.
SHAW, Justice, dissenting.
I disagree with the majority's conclusion that the trial court did not abuse its discretion in declining to excuse venireperson M.K. for cause.
Ms. K. violated the court's order by discussing the case with her husband who informed her that this homicide case also involved sexual battery. Ms. K. was a former rape victim and expressed concern about her ability to be impartial since her assailant was released early from prison and "did it again." The voir dire transcript reflects the following colloquy:

*1337 THE COURT: What is it you want to tell me, ma'am?
JUROR K.: Well, I don't know whether I can be any good on this or not because about ten years ago I was raped with a
THE COURT: Okay.... Why don't you come up to the bench? Yes, ma'am. What did you want to tell me?
JUROR K.: About ten years ago I was raped at knife point and I just don't think I canthis has been bothering me. I don't think I have
THE COURT: That experience, do you think that experience would affect your ability to sit
JUROR K.: I'm sorry?
THE COURT: Do you think that experience would affect your ability to sit impartially on this case if you were asked to serve?
JUROR K.: No. No, it would not.
THE COURT: Would it affect your ability to be impartial?
JUROR K.: (Witness nods head.)
THE COURT: Any questions for her?
MR. MORGAN [PROSECUTOR]: No, sir.
THE COURT: Mr. Udell, Mr. Nickerson?
MR. NICKERSON [DEFENSE COUNSEL]: Ms. WetmoreMs. K., pardon me. Is this something that has troubled you part of theApparently this is something that has troubled you, caused you some concern enough to bring it to the Judge's attention on this evening, is that
JUROR K.: Yes.
MR. NICKERSON: And prior to this evening you sat here for about three days and it hasn't bothered you?
JUROR K.: I didn't know what it was about.
MR. NICKERSON: Okay. Do you now know that this casethe State has told you that there's a homicide; is that right?
JUROR K.: (Witness nods head.)
MR. NICKERSON: Okay. Is there some other information that you have right now that makes you believe this prior experience that you have gives you great concern?
JUROR K.: Someone else told me it was rape and Ithat's what bothered me.
MR. NICKERSON: Who told you it was rape, ma'am?
JUROR K.: My husband.
MR. NICKERSON: Okay. Now that you know that this case does involve a sexual battery, ma'am, and you've come here to the Judge tonight to bring this to his attention this concern, can you say that when the evidence is presented here in court that your prior experience, this experience that happened to you ten years ago, that you would be able to keep that in a way that you will not be biased against Mr. Gore should you hear evidence of a sexual battery being presented in this case? Can you becan you tell the Judge that you can be completely fair to Mr. Gore. Can you keep this experience out from your deliberations if you're selected as a juror in this case?
JUROR K.: Yes. The only thing that bothers me, like this one that raped me was sent to jail. He had 20 years sentence and he only got six. They let him out and he did it again.
MR. NICKERSON: Okay. Based on ma'am, I understand that. Based on how that particular defendant was treated, the sentence that he got and how he was released back out again, do you think that you could sit if you were selected on this jury and deliberate whether or not Mr. Gore should get a sentence of life without parole for a 25-year period based on the fact this other defendant was released and went out and committed the offense again? Can you say that you can be completely unbiased in your determination of which sentence is appropriate based on how this other defendant was treated?
JUROR K.: Yes.
I agree with defense counsel's argument that by saying the "magic words," i.e., that she could set her experience aside, Juror K. was not rendered competent:
MR. UDELL [DEFENSE COUNSEL]:
. . . .

*1338 But, Judge, we'd ask you to go beyond the words, you saw her, she was obviously shaken about this incident, she obviously felt it was important enough and affected her enough to come forward and bring it to the Court's attention. We would ask you on whole considering the way she acted, her demeanor, what she had to say, given all due deference to the Defendant and following the law which requires that all reasonable doubts as to the issuance of jurors be impartial in favor of the Defendant,[[11]] we would ask to grant the challenge for cause as to Ms. K.
. . . .
THE COURT: I'll deny the challenge for cause based on simply because each and every question that was asked of her she indicated she could be fair and impartial and set it out of her mind.
Now, I understand what her husband may have told her in conversation, she indicated she stopped him, cut-off the conversation there and then before the Court with regard to this case her situation that she had in the past but to each question asked of her she never waivered [sic] or indicated she could not set that out of her mind and render a fair and impartial verdict. So I'll grantbut that's not reason to disqualify her. I'll deny the motion for cause [][c]hallenge for that. All right. Do you have any more cause?
The judge erred factually when he said Juror K. indicated she could be fair and impartial each time she was asked. She responded affirmatively ("Witness nods head.") when asked if her experience would affect her ability to be impartial. Several of her responses were equivocal at best.
This case differs from other Florida cases reversed for a trial court's refusal to strike a juror for cause in that Juror K. never verbally indicated an inability to be impartial.[12] In Williams v. State, 638 So.2d 976, 978 (Fla. 4th DCA 1994), the district court held that the trial court's failure to excuse a juror for cause (who had contacts with the United States Attorney's Office) constituted reversible error. The juror in Williams nodded his head when asked by defense counsel whether he had any apprehensions about being "a hundred percent sure that [he] could be fair and impartial." The court further questioned the juror on his ability to be fair and impartial and the juror stated, "I hope that I can [be fair and impartial]" and "I'll be impartial because that is my character." Id. at 978. In reversing the conviction, the district court in Williams stated:
A juror's subsequent statements that he or she could be fair should not necessarily control the decision to excuse a juror for cause, when the juror has expressed genuine reservations about his or her preconceived opinions or attitudes.
Id. at 979. Under this analysis, Juror K.'s statements, "I don't think I canthis has been bothering me. I don't think I have," when coupled with the nod of her head in response to the question regarding her ability to be impartial, amounts to an expression of "genuine reservations," about her potential bias.
Consistent with the principles enunciated in Williams for resolving these issues, the Third District, in Perea v. State, 657 So.2d 8 (Fla. 3d DCA 1995), reversed the defendant's conviction based upon the trial court's error in denying a juror challenge for cause:

*1339 The juror at issue turned in a questionnaire answer indicating that he was unsure whether he could give defendant a fair trial. This was partly because of a sexual molestation experience of one of the juror's family members. As was true in the Bryant case, the prospective juror indicated that he would follow the court's instructions, but his other responses on the ability to give a fair trial were equivocal. We conclude that there must be a new trial.
Id. at 9.
Finally, in Club West, Inc. v. Tropigas of Fla., Inc., 514 So.2d 426 (Fla. 3d DCA 1987), the Second District held that the trial judge's refusal to excuse a particular juror for cause was reversible error. The juror's husband owned stock in Raytheon, the defendant corporation, and stated that she might be inclined to let her knowledge of her husband's investment experiences with Raytheon figure into her decision in the case. In later questioning, however, she assured the court that she would weigh the evidence and impartially decide the case based on the evidence. In reversing the judgment, the district court stated:
Where a juror initially demonstrates a predilection in a case which in the juror's mind would prevent him or her from impartially reaching a verdict, a subsequent change in that opinion, arrived at after further questioning by the parties' attorneys or the judge, is properly viewed with some skepticism.
Id. at 427.
When a juror such as Ms. K. states that she can set aside her personal views and follow the law in light of the evidence presented, it is extremely difficult for the trial judge to divine whether she can in fact be impartial in light of her initial reservations founded on a negative personal experience,
"partly because the juror may have an interest in concealing [her] own bias and partly because the juror may be unaware of it." Though a juror might honestly believe she can be impartial, she nevertheless may have "such a close connection to the circumstances at hand that bias must be presumed."
Gonzales v. Thomas, 99 F.3d 978, 987 (10th Cir.1996)(quoting Smith v. Phillips, 455 U.S. 209, 221-22, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982), (O'Connor, J., concurring), and United States v. Scott, 854 F.2d 697, 699 (5th Cir.1988)), cert. denied, ___ U.S. ___, 117 S.Ct. 1342, 137 L.Ed.2d 501 (1997). Although Ms. K. did not admit to bias, "rape is a traumatic and heinous violation of personal integrity and autonomy,"[13] and in light of her equivocal responses, it defies human experience to believe that her emotional involvement would not compromise her impartiality, notwithstanding her best efforts to remain unbiased and objective. A vivid example of the depth of feeling experienced by a victim of a sexual battery is contained in a recent opinion from the Third District:
The trial court conducted the initial segment of voir dire. Because this was a sexual battery case, the court asked whether any of the jurors had been the victim of sexual abuse, or had a relative, friend or acquaintance who had been such a victim. The court explained in substance that if the answer was yes, any follow-up questions would be asked privately with only the judge and attorneys present.
Juror L. misunderstood the court's instruction. When the court began questioning individual prospective jurors in open court, Ms. L. answered the court's questions about employment, marital status, and prior jury service. She then went on to state that she had been a victim of incest, sexual molestation, and rape, and that she would not be able to give the defendant a fair trial. She then broke down crying and was comforted by the juror sitting next to her, juror Popejoy. The court called a recess and excused juror L. From further jury service.
Bauta v. State, 698 So.2d 860, 861 (Fla. 3d DCA 1997).
The statute governing disqualification, states that "No person interested in any issue to be tried therein shall be a juror in any cause." § 40.013(3), Florida Statutes *1340 (1995). I find it difficult to believe that a former rape victim who expressed concern about her assailant's early release and recidivism would not be "interested in any issue tried" where her options are to vote for the death penalty or risk the eventual parole of another convicted rapist (and murderer) who might "[do] it again."
"[J]urors should if possible be not only impartial, but beyond even the suspicion of partiality." Hill v. State, 477 So.2d 553, 556 (Fla.1985) (quoting O'Connor v. State, 9 Fla. 215, 222 (1860)). I would find that Ms. K. should have been excused upon Gore's challenge for cause for the following reasons: (1) she violated the court's order by discussing the case with her husband; (2) her responses regarding her ability to be impartial were equivocal; and (3) it is clear from the record that Ms. K. was raped at knifepoint, was traumatized by the experience and was bothered by the fact that her assailant who received a twenty-year sentence only served six. Once he was released, he apparently raped again; "they let him out and he did it again." A juror with these concerns should not be sitting on a case where she is called upon to determine whether the defendant, a convicted rapist, should be sentenced to life without parole for twenty-five years or death. When such a juror is challenged for cause, prudence would dictate that doubt as to the juror's impartiality should be resolved in favor of granting the challenge. Denying the challenge under these circumstances was an abuse of discretion. Consistent with my belief that Gore was denied an impartial and unbiased jury, I would reverse.[14]
ANSTEAD, J., concurs.
NOTES
[1] This Court affirmed Gore's original sentence of death in Gore v. State, 475 So.2d 1205 (Fla. 1985). Upon petition for a writ of habeas corpus, the United States District Court for the Middle District of Florida concluded that Gore's sentence of death was imposed in violation of Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), and Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and granted the petition. Gore v. Dugger, 763 F.Supp. 1110 (M.D.Fla.1989), aff'd, 933 F.2d 904 (11th Cir. 1991). A second sentencing proceeding was instituted, resulting in the instant appeal.
[2] These issues are: (1) the trial court erroneously permitted the State to create the impression that mercy and sympathy should play no role in the jurors' deliberations; (2) the trial court erred in permitting the State's psychiatrist to examine Gore; (3) the State engaged in improper argument to the jury; (4) the court erred in refusing to hear Gore's motion to suppress Michael Rock's identification of Gore; (5) the trial court erred in refusing to allow on cross-examination the introduction of an out-of-court statement Gore had made which implicated Waterfield; (6) the trial court erred in failing to enforce the rule of sequestration with respect to two State witnesses; and (7) the trial court erred in failing to conduct an allocution hearing before reaching its sentencing decision and in failing to consider allocution evidence.
[3] Gore also argues that juror Tobin should not have served on the jury. However, Tobin was not challenged for cause. Gore is therefore procedurally barred from arguing the matter on appeal.
[4] We note that after Gore exhausted his peremptory challenges, he asked for three more and identified the three that he would challenge. Yet, when the trial court granted him an additional peremptory challenge, he used it to challenge an unidentified juror whom he had not challenged for cause. When his subsequent challenge of another juror for cause was denied, he did not thereafter request any more peremptory challenges.
[5] Gore had been sentenced to two concurrent life sentences for the kidnappings of Regan Martin and Lynn Elliott and three life sentences for sexual batteries committed against Martin. The two kidnapping sentences were to run consecutive to the three sexual battery sentences.
[6] The statute was subsequently amended in 1994 to eliminate eligibility for parole for those convicted of first-degree murder. Ch. 94-229, § 1, at 1577, Laws of Fla.
[7] Stone was one of the prosecutors in Gore's first trial and Waterfield's trial.
[8] Gore claims he presented Stone's testimony to illustrate that if Gore was given a life sentence for the murder of Lynn Elliott, he would not be eligible for parole for 50 years. On cross-examination, Stone testified that Gore's five life sentences boiled down to the equivalent of two consecutive life sentences, and that none of his sentences contain any minimum mandatory sentence.
[9] § 810.08(1), (2)(c), Fla. Stat. (1981).
[10] The instruction was as follows:

The crime for which the defendant is to be sentenced was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. The kind of crime intended to be cold, calculated and premeditated is one that follows a careful plan or pre-arranged design.
[11] This Court has repeatedly applied the rule to which defense counsel refers:

[I]f there is a basis for any reasonable doubt as to any juror's possessing that state of mind which will enable him to render an impartial verdict based solely on the evidence submitted and the law announced at the trial he should be excused on motion of a party, or by the court on its own motion.
Singer v. State, 109 So.2d 7, 23-24 (Fla.1959).
[12] In the following instances, potential jurors gave equivocal verbal answers regarding their ability to be impartial, and it was held to be error for a trial judge to refuse to strike them for cause: "I would like to try," Gill v. State, 683 So.2d 158, 160 n. 1 (Fla. 3d DCA 1996); "I hope that I can," Williams v. State, 638 So.2d 976, 978 (Fla. 4th DCA 1994); "I think I can," Jones v. State, 660 So.2d 291, 292 (Fla. 2d DCA 1995); "I could do it," Price v. State, 538 So.2d 486, 489 (Fla. 3d DCA 1989); "I believe so," Coggins v. State, 677 So.2d 926, 927 n. 2 (Fla. 3d DCA 1996); "and I would try," Auriemme v. State, 501 So.2d 41, 42 (Fla. 5th DCA 1986).
[13] Gonzales v. Thomas, 99 F.3d 978, 990 (10th Cir.1996).
[14] Ms. K. sat on the jury even though Gore challenged her for cause, asked for additional peremptory challenges, specifically naming her as an objectionable juror, and after exhausting his peremptory challenges (including the additional one granted by the court) on other objectionable jurors, Gore objected to all the challenged jurors prior to the panel being sworn. See Trotter v. State, 576 So.2d 691, 693 (Fla.1990) ("Where a defendant seeks reversal based on a claim that he was wrongfully forced to exhaust his peremptory challenges, he initially must identify a specific juror whom he otherwise would have struck peremptorily. This juror must be an individual who actually sat on the jury and whom the defendant either challenged for cause or attempted to challenge peremptorily or otherwise objected to after his peremptory challenges had been exhausted.").