894 So.2d 849 (2005)
Jermaine LEBRON, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-1956.
Supreme Court of Florida.
January 13, 2005.
*850 Robert A. Norgard, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, Douglas T. Squire and Barbara C. Davis, Assistant Attorney's General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Jermaine Lebron appeals a circuit court judgment imposing the sentence of death upon resentencing. We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. For the reasons set forth herein, we again vacate Lebron's sentence of death and remand to the circuit court for a new penalty phase trial.

BACKGROUND AND FACTS
In 1998, Lebron was found guilty of the first-degree felony murder and robbery with a firearm of Larry Neal Oliver, Jr., and sentenced to death. On August 30, 2001, this Court affirmed Lebron's convictions, but vacated the death sentence and remanded the case for a new penalty phase. See Lebron v. State, 799 So.2d 997, 1001 (Fla.2001) ("Lebron I"). The facts giving rise to Lebron's convictions and sentence were explained in this Court's initial review as follows:
Appellant, Jermaine Lebron ("Lebron") was arrested in New York City for the murder of Larry Neal Oliver.... [Lebron's] first trial resulted in a mistrial, based upon the trial court's finding of a jury deadlock.
... During [the] second trial, it was established that Lebron was a major *851 participant in the robbery and murder of the victim (who worked with one of Lebron's acquaintances, Danny Summers). Indeed, all of the eyewitnesses testified that it was Lebron (nicknamed "Bugsy") who had directed the events both before and after the victim's death, and who, using a sawed-off shotgun (which he called "Betsy"), had fatally shot the victim.
According to eyewitnesses, the victim had been lured to a house in Osceola County (the "Gardenia house") where Lebron and several others were staying after Lebron offered to sell the victim some "spinners" for his truck. Shortly after the victim arrived at the home, Lebron called to him to come toward the back bedrooms. As the victim entered the hallway leading to the bedrooms, he was forced to lie face down, and was shot at short range in the back of the head. Eyewitnesses testified that, after the victim was shot, Lebron was smiling and laughing, yelling, "I did it. I did it," and describing how it felt to kill the victim, and what it looked like. Money, checks, and a credit card were taken from the victim, and stereo equipment was stripped from his truck. Lebron directed others present at the time to burn the victim's identification papers, to dispose of the victim's body, and to clean up the area where the victim had been shot.
Over the next several days, Lebron and some of the others used the victim's credit card, pawned his stereo equipment, and cashed his checks. An attempt was also made to burn the victim's truck. During this time, Lebron admitted to his former girlfriend, Danita Sullivan, that he had shot a man, that "he had killed someone." He also told his current girlfriend, Christina Charbonier, that he had killed a man for his truck. Shortly thereafter, Lebron left for New York City, the place where "Legz Diamond," a topless juice bar owned by his mother, was located.
The victim's body was later discovered in a rural area near the Walt Disney World property....
....
After Lebron left for New York, the others having knowledge of the event reported the murder to law enforcement officers. All of the witnesses claimed that they had followed Lebron's directions throughout the unfolding events because Lebron had threatened them, and they were afraid that he might do to one of them what he had done to Oliver.
Lebron I, 799 So.2d at 1001-02.
This case has taken a somewhat unusual and complex twist because, notwithstanding the only available above-outlined evidence, the first guilt phase jury made a special finding as to the felony murder conviction that Oliver was killed by a person other than Lebron, and that Lebron did not have a firearm in his personal possession at the time the murder occurred. See Lebron I, 799 So.2d at 1020 n. 19. With regard to the robbery conviction, the jury made a special finding that Lebron did possess a firearm during the commission of the robbery.
This Court vacated Lebron's original sentence for two reasons,[1] only one of which is pertinent to the instant appeal. We determined that the trial court had "erred in concluding, contrary to the jury's express findings, that `the evidence established beyond a reasonable doubt that the *852 defendant murdered Larry Neal Oliver, Jr.'" Id. at 1021. The Court approved the analysis of the trial court as required by Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), to determine whether Lebron was eligible for the death penalty based on his degree of participation in the murders, and determined that it "correctly analyzed Lebron's relative culpability, as compared to the other known participants." Id. at 1020. We determined, however, that notwithstanding the only evidence presented, the sentence imposed could not be premised "upon a finding that Lebron was himself the shooter, since this would be contrary to the jury's special verdicts." Id. at 1021.
Lebron's new penalty phase proceeding commenced on May 12, 2002, in Osceola County. At the close of the penalty phase, the jury recommended a sentence of death by a majority of seven to five. A Spencer[2] hearing was conducted on June 19, 2002, and on August 15, 2002, the trial court sentenced Lebron to death, finding two aggravators, no statutory mitigators, and several nonstatutory mitigators.
This appeal followed.

ANALYSIS
Prior to commencing the analysis, we pause to acknowledge the unique factual posture of the case before us, which generates unusual problems. The guilt phase jury determined that Lebron was guilty of felony murder, that he possessed a gun to rob Larry Neal Oliver, but that he did not possess a gun at the time of the murder, and that Oliver was actually shot by someone other than Lebron. With direct evidence such as that presented here, seldom does this Court review capital cases in which the guilt phase produces such specific, and seemingly inconsistent, verdicts.
That said, neither this Court nor the trial court can alter the original jury's findings with regard to the guilt issues. To the contrary, the judiciary's constitutionally mandated role in this context is to ensure that Lebron's sentence is not erroneously premised on facts and findings that would contravene the original jury's guilt determination. Bearing this in mind, we determine that Lebron's claim pertaining to the admissibility of certain testimony concerning a separate, unrelated case, the Nasser case, requires a new penalty phase proceeding. To ensure that the circuit court has proper guidance on resentencing, we will also address the scope and nature of the testimony and evidence that may be admitted during the new penalty phase.

PRIOR VIOLENT FELONY AGGRAVATOR
To establish the prior violent felony aggravator, the State relied in part on Lebron's convictions for robbing and kidnapping Roger Nasser. Lebron had initially been convicted of attempted first-degree murder, robbery with a firearm, and kidnapping in the Nasser matter, but these convictions were reversed on appeal because of juror misconduct. Upon retrial, the jury returned special verdicts finding that Lebron had committed only an assault but with a firearm (a lesser included offense of attempted first-degree murder, but not a recognized basis for an aggravating factor), robbery (instead of robbery with a firearm) and kidnapping with intent to commit a felony (again without a firearm). See Lebron I, 799 So.2d at 1004 n. 3.
*853 During Lebron's resentencing proceeding, the trial court admitted over defense counsel's objection the testimony of Officer Schroeder of the Kissimmee Police Department regarding the Nasser case. Schroeder testified that Nasser reported being confronted by two males, one black and the other white, in an apartment where he had gone to discuss giving money to Stacy Kirk, a friend of Lebron's. According to Nasser's police statement, the black male possessed a shotgun, and the white male possessed a stun gun. Schroeder relayed that Nasser informed police that his attackers blindfolded him, loaded him into a car, and drove him to an orange grove in Osceola county, at which time the black male forced him to his knees, placed the shotgun to his head, and said, "Tell the Lord Bugsy says `hi'." According to Schroeder, Nasser reported that the man pulled the trigger but the gun misfired, affording Nasser the opportunity to escape into the orange grove. Schroeder testified that Nasser subsequently identified those involved as Stacy Kirk, Howard Kendall, and "Bugsy," a name connected to Lebron. Schroeder also testified that Nasser disappeared prior to trial for that offense and apparently has been unavailable.
In general, it is proper to admit evidence regarding prior violent felony convictions to provide the sentencing jury the context of the crime. As this Court has recognized:
[I]t is appropriate in the penalty phase of a capital trial to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of the conviction. Testimony concerning the events which resulted in the conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence.
Rhodes v. State, 547 So.2d 1201, 1204 (Fla.1989); see also Jones v. State, 748 So.2d 1012, 1026 (Fla.1999) (permitting the admission of hearsay testimony from a police officer regarding defendant's past murder conviction). However, the State may not introduce testimony or evidence pertaining to prior violent felony convictions that is irrelevant, violates the defendant's confrontation rights, or where the probative value of the evidence is far outweighed by prejudicial effect. See Rhodes, 547 So.2d at 1205; see also § 90.403, Fla. Stat. (2002) ("Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice....")
In this case, the probative value of the evidence pertaining to Lebron's possession and use of a gun during the robbery and kidnapping of Roger Nasser was far outweighed by prejudicial effect. While the jury found that Lebron possessed a gun at the time of Nasser's assault,[3] simple assault is only a misdemeanor crime, see § 784.011(2), Fla. Stat. (2002), and cannot serve as a basis for the prior violent felony aggravator. See Carpenter v. State, 785 So.2d 1182, 1205 (Fla.2001). In determining that Lebron was guilty of robbery and kidnapping without a firearm, the Nasser jury effectively acquitted him of the possession or use of a gun during the commission of those felonies. Therefore, evidence of the firearm should not have been introduced in the instant matter for the purpose of establishing the prior violent felony aggravator because the *854 jury found no firearm associated with such crimes. In drawing this conclusion, we also note that the State did not seek to admit Officer Schroeder's testimony as similar crime evidence under the rule established in Williams v. State, 110 So.2d 654, 663 (Fla.1959). Moreover, we reject any attempt to justify admitting evidence of Lebron's possession and use of a gun during the assault on Nasser as inextricably intertwined with the kidnapping and robbery convictions.
The prejudice resulting from the erroneous admission of this evidence is only underscored by the strong, striking parallel between the offense described against Nasser and that committed in the instant matter. Nasser described being forced to the ground and having a shotgun placed to his head. It would have defied natural human impulse for a jury hearing that description to draw any other conclusion than that Lebron committed essentially the same act against Oliver. However, such a conclusion contravenes the original jury's special findings in the instant matter, and therefore comprised an improper basis for the jury's sentencing recommendation.
Given the highly prejudicial nature of the testimony offered by Officer Schroeder, we determine that the State cannot prove beyond a reasonable doubt that the trial court's error in admitting evidence pertaining to Lebron's possession and use of a gun during the Nasser incident did not contribute to the jury's death recommendation in the instant matter. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). On this basis, we must vacate Lebron's death sentence, and remand for a new penalty phase.

EVIDENCE UPON RESENTENCING
Though we need not address any other claim of error for the purpose of disposing with the instant matter, we will address the scope and nature of evidence that may be admitted in the new penalty phase proceeding. We reaffirm the determination made in our initial review of this case, that "[u]pon remand, the trial court ... may assess the defendant's relative culpability in light of the facts, established by the record, that Lebron was an orchestrator of and major participant in the felonies charged, and that no other known participant was proven to be the shooter." Lebron I, 799 So.2d at 1021. We have never suggested that the evidence be "changed" or "falsified." However, we do instruct that in conducting that assessment, the trial court must exclude any and all evidence and testimony which specifically names Lebron as the individual who actually shot Larry Neal Oliver.
It is axiomatic that the trial court has broad discretion in determining the admissibility of evidence in penalty phase proceedings. See, e.g., Perry v. State, 801 So.2d 78, 89-90 (Fla.2001); Hildwin v. State, 531 So.2d 124, 127 (Fla.1988), aff'd, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989). Moreover, this Court has determined that, upon resentencing, the trial court may allow the jury to hear probative evidence to aid it in understanding the facts of the case so that it may render an appropriate advisory sentence. See Bonifay v. State, 680 So.2d 413, 419 (Fla.1996); Teffeteller v. State, 495 So.2d 744, 745 (Fla.1986). The trial court may not, however, admit evidence that simply relitigates the issue of the defendant's guilt, see Teffeteller, 495 So.2d at 745, or evidence that fails the test balancing probative value against the danger of unfair prejudice. See § 90.403, Fla. Stat. (2002); Mendyk v. State, 545 So.2d 846, 849 (Fla.1989). This is particularly true where the evidence advanced is directly and precisely to the *855 contrary of a specific factual finding by a prior jury.
Applying those rules to the evidence submitted during the proceeding below, evidence that may be submitted again during the new penalty phase, we determine that it would be error for the trial court to admit those portions of the hearsay testimony of Detective Lang in which he specifically relayed that Lebron had admitting to firing the shots which caused the death of the victim. Detective Lang could certainly testify that Lebron had requested several witnesses to provide an alibi for him for the night of the murder, and that no other known participant was proven to be the shooter. He simply could not testify that the investigation proved that Lebron shot the victim, that eyewitnesses reported seeing Lebron commit the actual shooting, or that Lebron, himself, admitted to actually firing the death shots.
The State could certainly recall Charissa Wilburn, or sponsor other witnesses, to provide testimony regarding the events that occurred the night of Oliver's murder. Such testimony can focus on Lebron's possession of the shotgun during the events leading up to the murder, his role in luring Oliver to the murder scene, his statements in the car prior to arriving at the Gardenia house, his beckoning the victim toward the back bedrooms, his voice being heard in the hallway ordering the victim to the ground, the sounds of weapon discharge, his agitated or excited state after the murder occurred,[4] his ordering the others to clean up the crime scene and dispose of the body, and his role in possessing and disposing of the victim's property. Again, however, the trial court must exclude any evidence or testimony that specifically states that Lebron was seen actually shooting the victim, that others heard that it was Lebron who shot the victim, or that Lebron admitted that he was the shooter.
So that we may be abundantly clear, our determination today does not, as the State contends, require the change, alteration, modification, or falsification of any witness testimony. We are simply mandating that the trial court fulfill its capacity as the guardian of the constitutional rights accorded every criminal defendant in this state. A jury has already considered whether Lebron actually personally shot Oliver, and determined that he did not. The State may not submit to a new penalty phase jury that Lebron actually committed the specific act for which he was acquitted.
The witnesses need not change their versions of events. All that is required for the trial court to fulfill its duty is to foreclose lines of questioning, summaries, or approaches designed to elicit testimony that Lebron was the shooter, require the State to tailor questions regarding the events on the night of the murder and subsequent investigation carefully, and ensure that the parties inform the witnesses of the scope of proscribed testimony to avoid any confusion that may produce even an unintended slip of prohibited facts. The trial court must also ensure that the State's opening and closing arguments are not based on excluded evidence. Despite the State's protestations, the exclusion of evidence in this manner to protect a defendant's constitutional right to a fair trial, as with most rules concerning the exclusion of certain evidence otherwise probative, is not a novel or extreme measure. To the contrary, it is precisely what our constitution, state laws, and rules of evidence require.

*856 CONCLUSION
Based on the foregoing, we vacate Lebron's death sentence and remand the case to the circuit court for a new penalty phase proceeding consistent with the dictates of this opinion.
It is so ordered.
PARIENTE, C.J., and ANSTEAD, LEWIS, CANTERO, and BELL, JJ., concur.
QUINCE, J., dissents with an opinion.
WELLS, J., recused.
QUINCE, J., dissenting.
I dissent from the majority's determination that the trial court committed reversible error in the penalty phase proceedings by permitting Officer Schroeder to testify about the facts surrounding Lebron's convictions for assault with a firearm, robbery, and kidnapping with intent to commit a felony in the Nasser case. I do not agree that the probative value of the evidence from the Nasser case is outweighed by its prejudicial effect. I believe, for several reasons, that the trial court properly admitted this evidence as part of the prior violent felony aggravating circumstance.
First, the evidence presented to the jury regarding the details of the Nasser case as relayed by Officer Schroeder comprised only thirteen pages of the 1047-page penalty phase record. It was not a feature of the presentation of evidence during this penalty phase. Similarly, the prosecutor's discussion of the Nasser case covers less than one page of a nearly thirty-page closing argument.
Second, the two incidents are not sufficiently similar to have created the prejudicial effect which the majority concludes it does. In the Nasser case, Jermaine Lebron, Howard Kendall, and Stacy Kirk threatened Nasser with both a stun gun and a shotgun while in an apartment. Lebron and Kendall blindfolded Nasser, loaded him into a car, and drove him into an orange grove where Lebron then unsuccessfully attempted to shoot him as retribution for allegedly attempting to rape a female friend. When the gun misfired, Nasser escaped into the orange grove. In the instant case, Oliver voluntarily followed Lebron and his cohorts back to their house under the guise of looking at some spinner rims for his truck. Once there, he was called to come to a bedroom and then shot in the hallway. The victim was robbed of his personal possessions (money, checks and a credit card) and stereo equipment was taken out of his truck. Orders were given to dispose of the victim's body. These two criminal episodes, which appear to result from different motivations, are sufficiently dissimilar, even with the information concerning the possession of the firearms, so that the probative value of the evidence outweighs its prejudicial effect.
Third, the majority states, "[W]e reject any attempt to justify admitting evidence of Lebron's possession and use of a gun during the assault on Nasser as inextricably intertwined with the kidnapping and robbery convictions." Majority op. at 8. However, the jury in the Nasser case found that Lebron possessed a gun at the time of the assault, a crime committed contemporaneously with both the robbery and the kidnapping. These crimes are inextricably intertwined.
Fourth, this Court has repeatedly held that "[w]hether a crime constitutes a prior violent felony is determined by the surrounding facts and circumstances of the prior crime. See Gore v. State, 706 So.2d 1328, 1333 (Fla.1997)." Anderson v. State, 841 So.2d 390, 407 (Fla.), cert denied, 540 U.S. 956, 124 S.Ct. 408, 157 L.Ed.2d 292 (2003). By holding that the trial judge *857 erred in admitting the surrounding facts and circumstances in the Nasser case, we are effectively ignoring a long line of cases permitting this type of evidence. See Gore, 706 So.2d at 1333; Anderson, 841 So.2d at 407; Spann v. State, 857 So.2d 845, 855 (Fla.2003); Rose v. State, 787 So.2d 786, 800 (Fla.2001); Lockhart v. State, 655 So.2d 69, 72 (Fla.1995).
Lastly, "[d]uring penalty proceedings, it is appropriate to introduce details of a prior violent felony conviction in the form of hearsay testimony so long as the defendant has a fair opportunity to rebut." Bowles v. State, 804 So.2d 1173, 1184 (Fla.2001). In the instant case, the defense not only cross-examined Officer Schroeder but also had the ability to rebut the hearsay testimony of Officer Schroeder with the testimony of the other witnesses who were present when the assault, robbery, and kidnapping of Nasser occurred (i.e., Jermaine Lebron, Stacy Kirk, and Howard Kendall).
For these reasons, I dissent.
NOTES
[1] The trial court's erroneous finding of the "commission while on probation" aggravator, which was not a part of Florida law at the time of the crime, was the other basis for vacating Lebron's sentence. See id. at 1020.
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] The State does not contend, and there is no basis in the record to determine, that the jury's special finding regarding Lebron's possession and use of a gun enhanced the simple assault misdemeanor conviction. Lebron was not found guilty of aggravated assault.
[4] Of course, our determination today would preclude admission of testimony that Lebron exclaimed, "I did it. I did it," after the murders, or described what it felt like or looked like to slay the victim.