# Supreme Court of Florida

_____

No. SC18-385
_____

**BENJAMIN DAVIS SMILEY, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

May 14, 2020

PER CURIAM.

Benjamin Davis Smiley, Jr. appeals a circuit court judgment sentencing him to death.[1]  As we explain, we affirm the conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

### I.      Guilt Phase

Mark Wilkerson lived in Lakeland with his brother Mario, his mother, and his 58-year-old stepfather, Clifford Drake.  Late at night on April 15, 2013, as he was putting away his bicycle, Wilkerson heard rattling coming from the chain link

---

1.  We have jurisdiction.  _See_ art. V, § 3(b)(1), Fla. Const.

fence at the rear of his home.  Wilkerson saw two men, both wearing dark sweatshirts, standing on the other side of the fence.  Wilkerson recognized neither man.  He called out to them, asking what they were doing.  The shorter of the two—we now know it was the defendant, Smiley—pointed a gun at Wilkerson and commanded that he come toward them.  Smiley and the other man jumped the fence, and Smiley ordered Wilkerson to take off his clothes and get on the ground.  Smiley pointed his gun at Wilkerson and yelled at him, demanding to know where Wilkerson's stepfather kept a safe with money.  Wilkerson denied knowing about any safe or money, and he begged for his life.  Smiley went through the pockets of Wilkerson's pants and took Wilkerson's cellphone, a small amount of cash, and a key to the home.

Smiley told Wilkerson to put his pants back on.  Keeping the gun trained on Wilkerson, Smiley marched him to the front door of the home, all the while threatening to kill Wilkerson if he made any noise.  Wilkerson, Smiley, and the other man entered the home, and Wilkerson led them to Drake's bedroom, where Drake lay asleep.  At first, Smiley entered the dark bedroom alone, but he was unable to find the safe.  Smiley ordered Wilkerson to go into the room and turn on the light.  Smiley then struck the still-sleeping Drake on the head with the gun. Startled, Drake scooted around on the bed while Smiley shouted at him, pointing the gun in Drake's face and demanding to know where Drake kept his money.

Drake denied having any. Smiley then shot Drake in the hip and continued to ask about the money. Seconds later, Smiley fatally shot Drake in the chest.

Smiley returned his focus to Wilkerson, ordering him at gunpoint to help find Drake's money. Smiley watched while Wilkerson ransacked the bedroom, to no avail. Eventually the taller man, who had been mostly silent throughout this episode, warned Smiley that someone was coming. Smiley commanded Wilkerson to get on the ground, and he complied. Smiley and his accomplice then ran from the home, leaving behind a backpack.

The police immediately began an investigation. Though the murder weapon was never found, analysis of bullets recovered at the scene showed that the gun from the Drake murder had also been used less than a month earlier in a nearby shooting. Otherwise the case went cold for nearly two years. Then, in February 2015, the police learned that DNA recovered from the backpack and from a sweatshirt found near the crime scene matched Smiley's DNA. The police showed Mark Wilkerson a photo lineup, and he identified Smiley as the shooter.

The police also revisited phone records showing that, minutes after the Drake murder, Mark Wilkerson's stolen cell phone had been used in a three-way phone call. That in turn led the police to two of the participants in that call, John McDonald and Samantha Lee. McDonald, whose mother lived across the street from the Drake home, is Smiley's cousin. Lee is Smiley's aunt.

McDonald testified at trial that, during a card game, Mario Wilkerson had bragged that his stepfather (Drake) kept money in a safe. Within a few days, McDonald, Lee, and Smiley hatched a plan to rob Drake. The night of the murder, McDonald picked up Smiley and "Big Jit" from Lee's house in Tampa and drove them to the parking lot of an apartment complex behind the Drake residence in Lakeland. McDonald had not met Big Jit before and was surprised by his participation, but Lee vouched for him. The plan was for Smiley and Big Jit to carry out the robbery and for McDonald to pick them up afterward. McDonald waited for a while after watching Smiley and Big Jit walk toward the Drake home, but he drove off after seeing Mark Wilkerson ride by on his bicycle. Eventually McDonald got a call from Lee, who patched Smiley into a three-way call so that McDonald and Smiley could find each other.

When Smiley got in the car he angrily told McDonald that it had been a "blank mission"—the only proceeds of the robbery were Wilkerson's cell phone and a small bag of marijuana. Smiley had been unable to find the safe. And Smiley told McDonald that "the dude that was asleep looked like he was reaching for something and he [Smiley] shot him."

Smiley testified in his own defense at trial. He acknowledged his familial relationship with McDonald and Lee and his friendship with "Big Jit" (whose

- 4 -

actual name is Casey Bisbee), but he denied having been part of any plan to rob Drake. He further denied even being in Lakeland on the night of the murder.

On October 6, 2016, the jury found Smiley guilty of the first-degree felony murder of Clifford Drake, robbery with a firearm of Mark Wilkerson, aggravated assault with a firearm of Mark Wilkerson, and burglary of a dwelling with an assault or battery while armed with a firearm, all as charged in the indictment. John McDonald, Samantha Lee, and Casey Bisbee were not charged with crimes for their roles in the Drake murder.

## II. Penalty Phase

The penalty phase began in April 2017 and was conducted before a different jury. As to the State's case, the most significant difference from the guilt phase is that the prosecution was able to present evidence about Smiley's prior conviction for the March 2013 first-degree murder of Carmen Riley. John McDonald described circumstances similar to those surrounding the Drake murder. Riley lived in the same neighborhood as Drake and McDonald's mother. McDonald selected her as a target and planned the robbery with Smiley and Samantha Lee. Smiley's role was to carry out the robbery, McDonald was the driver. After the robbery and murder, Smiley told McDonald that he shot Riley because she refused to cooperate. Smiley shot Riley with the same revolver he would use weeks later to kill Drake.

The defense case for mitigation focused largely on the effects of two ruptured brain aneurysms that Smiley suffered in September 2012, less than a year before he murdered Drake and Riley. Dr. Alan Waldman, a neuropsychiatrist, testified that bleeding from the ruptured aneurysms had caused severe damage to the parts of Smiley's brain that affect behavior and impulse control. In particular, according to Waldman, the brain damage resulted in Smiley having problems with rage control. Dr. Hartig, a psychologist hired by the defense but whom the State called as a rebuttal witness, similarly testified that Smiley's ruptured aneurysms constituted a severe brain trauma. (Hartig also testified that Smiley generally performed well on the personality tests she administered, and that Smiley scored 114 on an IQ test.)

The defense complemented the experts' testimony with testimony from Smiley's mother, from Michael Clayton (a former pro football player who had mentored Smiley for years), and from Samantha Lee, all of whom testified that Smiley's personality changed significantly after the ruptured aneurysms. According to these witnesses, Smiley developed a bad temper and mood swings, and he would rant on social media over relatively insignificant matters—all of which was out of character for him. Lee acknowledged that Smiley had a temper and got in fights before the aneurysms, but she testified that post-aneurysm Smiley was "just wild." Smiley's mother acknowledged that she had not personally

observed Smiley's personality changes, but she trusted what she had heard about Smiley's behavior from her own mother and from Lee.

The defense witnesses testified that, while Smiley's childhood had not been without its difficulties, his post-aneurysm behavior was very inconsistent with his past. Smiley did not have a relationship with his biological father until age 18, but he was close with his stepfather, who was married to Smiley's mother from Smiley's infancy and treated him as his own child. Smiley attended a private Christian school and did well academically and in extracurricular activities. Smiley's mother and stepfather were devoutly religious and strict, and the stepfather disciplined Smiley with corporal punishment—Smiley told Dr. Hartig that it did not rise to the level of abuse, but Smiley thought it was overly harsh compared to how his siblings were treated. Smiley learned construction from his stepfather, which enabled Smiley to work home renovation jobs for his mentor. At age 16, Smiley moved out of his parents' house because he no longer wanted to live under their strict rules. From then on he lived intermittently with Samantha Lee, with his girlfriend, with friends and other relatives, or in houses that he was working on. Smiley drank and smoked marijuana, but he did not have a history of significant violence before the aneurysms.

The defense's penalty phase closing argument had two principal themes. First, that Smiley's brain damage and its effects on his temper and impulse control

had led to behavior that was inconsistent with his essential character. And second, that the jury should take into account that John McDonald and Samantha Lee had escaped responsibility for their role in the Drake and Riley murders, even though (according to the defense) they had taken advantage of Smiley and led him to commit those crimes. Defense counsel summed up his argument saying: "There's simply this: Are these mitigating factors that he has brain damage from something outside of his control enough to offset his actions?"

The jury unanimously found the following aggravating factors proven beyond a reasonable doubt: (1) Smiley was previously convicted of another capital felony, the murder of Carmen Riley; (2) Smiley was previously convicted of a felony involving the use or threat of violence to the person, robbery with a firearm regarding Carmen Riley; (3) Smiley was previously convicted of a felony involving the use or threat of violence to the person, robbery with a firearm regarding Mark Wilkerson; (4) Smiley was previously convicted of a felony involving the use or threat of violence to the person, aggravated assault regarding Mark Wilkerson; (5) Smiley was previously convicted of a felony involving the use or threat of violence to the person, burglary with an assault or battery while armed regarding Clifford Drake and Mark Wilkerson; (6) Smiley committed the Drake murder while engaged in the commission of robbery regarding Mark Wilkerson; (7) Smiley committed the Drake murder while engaged in the

commission of burglary with an assault or battery while armed with a firearm regarding Clifford Drake and Mark Wilkerson; and (8) Smiley committed the murder for pecuniary gain regarding Clifford Drake.

The jury's votes on Smiley's proposed mitigating circumstances were as follows: no significant history of prior criminal activity, 5 yes to 7 no; the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance, 0 to 12; the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, 0 to 12; the age of the defendant at the time of the crime, 0 to 12; mitigation related to the defendant's character, 7 to 5; mitigation related to the defendant's background, 0 to 12; mitigation related to the life of the defendant, 0 to 12; and mitigation related to the circumstances of the offense, 1 to 11.

After performing the statutorily required assessment and weighing of aggravating factors and mitigating circumstances, the jury unanimously recommended that the trial court sentence Smiley to death.

### III.   Spencer Hearing

The court held a *Spencer*[2] hearing on November 13, 2017.  The State did not put on any evidence at the hearing.  Smiley called one witness, Dr. Hartig.

Dr. Hartig's testimony was similar to her testimony at the penalty phase.  Dr. Hartig explained information from Smiley's background that assertedly related to mitigation.  She discussed (1) Smiley's lack of relationship with his biological father; (2) Smiley's lack of relationship with his stepfather; (3) Smiley being the subject of corporal punishment; (4) Smiley running away from home and essentially being homeless; (5) Smiley's persistence in pursuing his education despite his circumstances; (6) Smiley's various paying jobs and good work ethic; (7) Smiley's aneurysms; (8) Smiley's lack of juvenile criminal history; and (9) Smiley's remorse for the victims.  Dr. Hartig also testified that Smiley seemed to lack problem-solving abilities, which she linked to his traumatic brain event.

### IV.   Sentencing

The court held a sentencing hearing on February 23, 2018.  As to the count of first-degree murder, the lower court sentenced Smiley to death.  The trial court found that the State proved eight aggravating factors beyond a reasonable doubt[3]

---

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

3. The trial court assigned the following weights to the aggravating factors: (1) Smiley was previously convicted of another capital felony (the murder of Carmen Riley) and (2) Smiley was previously convicted of a felony involving the

and the defense established five mitigating circumstances by the greater weight of the evidence.[4] The court gave the jury's recommendation "great weight" and concluded that "the mitigation pales in comparison to the proven aggravating factors." The trial court sentenced Smiley to death, his sentences for the other convictions to run concurrently with this sentence. This direct appeal followed.

---

use or threat of violence to the person (robbery with a firearm involving Carmen Riley) (merged, great weight); (3) Smiley was previously convicted of a felony involving the use or threat of violence to the person (robbery with a firearm involving Mark Wilkerson) and (6) Smiley committed the first-degree murder while engaged in a robbery (of Mark Wilkerson) (merged, great weight); (4) Smiley was previously convicted of a felony involving the use or threat of violence to the person (aggravated assault of Mark Wilkerson) (no weight); (5) Smiley was previously convicted of a felony involving the use or threat of violence to the person (burglary with an assault or battery while armed involving Clifford Drake and Mark Wilkerson) and (7) Smiley committed the first-degree murder while engaged in a burglary of a dwelling with an assault or battery while armed with a firearm (involving Clifford Drake and Mark Wilkerson) (merged, moderate weight); (8) the first-degree murder was committed for pecuniary gain (substantial weight).

4. The trial court assigned the following weights to the mitigating circumstances: (1) Smiley has no significant history of prior criminal activity (moderate weight); (2) Smiley committed the first-degree murder while under the influence of extreme mental or emotional disturbance (little weight); (3) the capacity of Smiley to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (little weight); (4) Smiley's age at the time of the crime (little weight); (5) the existence of any other factor(s) in Smiley's character, background, life, or the circumstances of the offense that would mitigate against the imposition of the death penalty (moderate weight).

- 11 -

# ANALYSIS

Smiley raises the following claims on appeal: (1) the trial court erred in finding that the State did not commit a discovery violation and in failing to make adequate findings under *Richardson v. State*, 246 So. 2d 771 (Fla. 1971), regarding a photograph of Smiley and Casey Bisbee; (2) the trial court erred in admitting two photographs over an objection for lack of proper predicate and prejudicial impact; (3) the trial court abused its discretion in denying a defense motion for mistrial after the testimony of John McDonald about Smiley's other crimes; (4) the trial court abused its discretion in denying a defense motion for mistrial after John McDonald's testimony about Smiley's interest in the outcome of his case; (5) the trial court erred in denying a motion for mistrial following the State's comment in penalty phase voir dire regarding the frequency with which the state attorney's office seeks the death penalty; (6) the trial court erred in allowing the State to argue during the penalty phase that Smiley possessed and discharged a firearm; (7) the penalty phase closing arguments violated Smiley's constitutional rights, entitling him to a new trial; (8) the penalty phase jury instructions and verdict form were improper and reversible error; and (9) the trial court's sentencing order was legally deficient and incorrect as a matter of law. We will also consider whether there is sufficient evidence to sustain the conviction and whether Smiley's death sentence is proportionate.

## I.    Discovery Violation

During the trial, the State introduced into evidence two photographs depicting Smiley with Casey Bisbee.  The State disclosed one of the photos (photographic exhibit 162) in pretrial discovery well in advance of trial.  Detective Wallace had viewed the photo on Smiley's publicly accessible Facebook page, downloaded the photo, and given it to the prosecutor.  The second photo (photographic exhibit 161) is one that Detective Wallace had also seen on Smiley's Facebook page more than a year before trial, but he did not download it.  Several days into the trial, after her testimony on the Friday of a holiday weekend, Samantha Lee gave the State's investigator a copy of that same photo.  Two days later, on Sunday, the prosecution e-mailed the photo to the defense.  When the trial commenced again on Tuesday, the defense objected to the introduction of the photo, arguing that the State had committed a discovery violation by not disclosing the photo earlier.  The defense argued that its trial preparation had been prejudiced because, compared to the photo that the State had disclosed in discovery, the second photo more starkly depicted the differences between Smiley and Bisbee in height, weight, and skin complexion.  The trial court heard argument from both sides and concluded that there had been no discovery violation.

When, as here, a criminal defendant properly elects to participate in the discovery process, that process is governed by Florida Rule of Criminal Procedure

- 13 -

3.220.  We apply the abuse of discretion standard to review a trial court's ruling on an alleged discovery violation.  *Andres v. State*, 254 So. 3d 283, 293 (Fla. 2018).

We find no abuse of discretion in the trial court's conclusion that the State did not commit a discovery violation.  Rule 3.220(b)(1)(K) requires the State to timely disclose to the defense "any tangible papers or objects that the prosecuting attorney intends to use in the hearing or trial and that were not obtained from or that did not belong to the defendant."  After the State's initial disclosure, rule 3.220(j) imposes a continuing discovery obligation when "a party discovers additional witnesses or material that the party would have been under a duty to disclose or produce at the time of the previous compliance."  Here, the record shows that the State had no intention of using the disputed photo at trial until Samantha Lee provided it to the State's investigator after Lee finished testifying.  In its presentation to the trial court, defense counsel acknowledged that the timing of the State's disclosure of the disputed photo reflected neither intentional misconduct nor bad faith.  Under these circumstances, we see no violation of rule 3.220 subdivisions (b)(1)(K) or (j).

In his reply brief, Smiley for the first time invokes rule 3.220(b)(1)(F) in support of his argument that the State committed a discovery violation.  That rule requires disclosure of "any tangible papers or objects that were obtained from or belonged to the defendant."  Smiley did not make an argument based on rule

3.220(b)(1)(F) either before the trial court or in his initial brief in this appeal. Smiley did attempt to persuade the trial court that Detective Wallace's initial viewing of the photo on Smiley's Facebook page meant that the State had possession or control of the photo from that moment on. But Smiley made no argument that a photo posted on a publicly accessible Facebook page (and viewed by an agent of the State) should be deemed an object that was "obtained from or belonged to the defendant" for purposes of the rule. Smiley has not preserved this argument for our review.

In any event, even if the State had committed a discovery violation by untimely disclosing the disputed photo, we would conclude beyond a reasonable doubt that Smiley suffered no procedural prejudice from any such violation. *See Smith v. State*, 7 So. 3d 473, 507 (Fla. 2009) (in the context of discovery rule violations, harmless error inquiry asks whether the violation materially hindered defendant's trial preparation or strategy). To the extent that any physical differences between Smiley and Bisbee were a material issue at trial, that was entirely foreseeable by both the prosecution and the defense. The defense knew through the State's discovery disclosures that the State had in its possession another photo of Smiley and Bisbee together and that the State had viewed Smiley's Facebook page. Even if there are differences between the two photos, Smiley surely anticipated that the State would have many ways to elicit testimony

- 15 -

and to present evidence about Smiley's and Bisbee's appearances, and Smiley knew to prepare accordingly. Under these circumstances, we see no procedural prejudice to the defense from the trial court's decision to allow the State's introduction of photographic exhibit 161.

## II.      Admission of Photographic Evidence

### A.      Authentication

Smiley contends that the trial court improperly admitted photographic exhibit 161 (the disputed photo just discussed) because the State failed to properly authenticate the photo. The State introduced the photo through the testimony of Detective Wallace. Wallace testified that, from his interview of Samantha Lee, he had developed a lead as to the person who was with Smiley during the Drake murder. Lee had provided Wallace the person's first name and nickname (Casey, "Big Jit") and a physical description. After the interview, Wallace looked at Smiley's publicly accessible Facebook page and saw photos of Smiley with a person matching the name and appearance Lee had described. Wallace later learned Bisbee's full name and met both Smiley and Bisbee in person. To establish the foundation for admission of photographic exhibits 161 and 162, Wallace testified that he was personally familiar with Smiley and Bisbee, that he had seen the photos on Smiley's Facebook page, and that the photos depicted Smiley and Bisbee together. Smiley now claims that this was insufficient, because

Wallace did not himself download photographic exhibit 161 from Smiley's Facebook page and did not know when or by whom the photo was taken.

The proponent of photographic evidence bears the burden of establishing that the evidence is a fair and accurate representation of the events depicted. *Mullens v. State*, 197 So. 3d 16, 25 (Fla. 2016). "Any witness with knowledge that it is a fair and accurate representation may testify to the foundational facts; the photographer need not testify." Charles W. Ehrhardt, *Ehrhardt's Florida Evidence* § 401.2, at 176 (2019 ed.). Authentication for the purpose of admission is a relatively low threshold that requires evidence sufficient to support a finding that the photograph in question is what the proponent claims. *See Mullens*, 197 So. 3d at 25. We review conclusions by the trial court regarding authentication for abuse of discretion. *Id.*

Here the State authenticated photographic exhibit 161 through the testimony of Detective Wallace. Based on his ability personally to identify both the defendant and Bisbee, Wallace testified that the photograph depicted those two men, and he further testified that he had seen the photograph on Smiley's Facebook page. Wallace did not testify about any matter beyond his personal knowledge. For example, he did not address the date of the photograph, the identity of the photographer, or the circumstances under which the photo was taken. Wallace's testimony was sufficient to establish that the photo is what the

State claimed it to be: a photo depicting Smiley and Bisbee, one Wallace had seen on Smiley's Facebook page. We find no merit in Smiley's argument that the photo was improperly authenticated.

Notably, Smiley does not challenge the photo's authenticity. In fact, when asked about Photographic Exhibit 161 on cross-examination, Smiley admitted that the photo depicted Bisbee and him, and he gave an approximate date that the picture was taken. Smiley also explicitly acknowledged the photo's accuracy. We deny relief on this claim.

### B.     Probative Value vs. Prejudicial Impact

Smiley further contends that the court improperly admitted photographic exhibits 161 and 162 on the ground that the photographs' prejudicial effect substantially outweighed their probative value. Defense counsel objected to the admission of photographic exhibit 161 because it showed Smiley holding a liquor bottle and Bisbee gesturing as if he had a gun. Photographic exhibit 162 showed Smiley making the gun gesture and Bisbee smoking what appeared to be a blunt. We apply an abuse of discretion standard to a trial court's application of the unfair prejudice test of section 90.403, Florida Statutes (2019). *Floyd v. State*, 913 So. 2d 564, 574 (Fla. 2005).

Combining aspects of testimony given by John McDonald, by Samantha Lee, by Mark Wilkerson, and by the defendant himself, the photographs supported

the State's theory that Smiley and Bisbee were close friends and that Bisbee was Smiley's accomplice during the Drake murder. Smiley argues that this probative value was substantially outweighed by the danger of unfair prejudice caused by the photos. According to Smiley, the photos had only limited relevance and were unfairly prejudicial because they portrayed the defendant "like a thug."

We disagree that the danger of unfair prejudice from the photos substantially outweighed their probative value. The identity and appearance of Smiley's accomplice during the murder were material issues in the case. And while the photos may have shown Smiley in an unfavorable light, they were not inflammatory or improperly directed at the jury's emotions. *See McDuffie v. State*, 970 So. 2d 312, 327 (Fla. 2007) (exclusionary rule of unfair prejudice "is directed at evidence which inflames the jury or appeals improperly to the jury's emotions" (quoting *Steverson v. State*, 695 So. 2d 687, 688-89 (Fla. 1997))). "The weighing of probativeness versus unfair prejudice is best addressed by the trial court," *Floyd*, 913 So. 2d at 575, and the trial court did not abuse its discretion in admitting these photos. We deny relief on this claim.

### III. Testimony About Smiley's Prior Crimes or Bad Acts

On direct examination, the State elicited testimony from John McDonald that Smiley had gloves with him at the time of the Drake murder. On cross-examination, defense counsel asked McDonald why he thought that Smiley had

gloves with him.  McDonald responded: "Well, when we normally operate like that, we normally use gloves."  The trial court denied Smiley's subsequent motion for a mistrial, and Smiley now argues that this was an error that requires reversal for a new trial.  We review the denial of a motion for a mistrial for abuse of discretion.

" 'A motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial.'  In other words, '[a] motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial.' "  *Morris v. State*, 219 So. 3d 33, 44 (Fla. 2017) (first quoting *Salazar v. State*, 991 So. 2d 364, 372 (Fla. 2008), and then quoting *England v. State*, 940 So. 2d 389, 401-02 (Fla. 2006)).  McDonald's vague reference to "when we normally operate like that" lacked any detail about other crimes and does not come close to meeting the high standard that justifies a mistrial.  Moreover, the defense itself invited the response through its open-ended question: "But why do you think he had [gloves] with him then?"  Finally, defense counsel declined the trial court's offer of a contemporaneous curative instruction.  This claim lacks merit.

## IV.  Testimony About Smiley's Interest in the Outcome of His Case

John McDonald initially denied to law enforcement that he had been involved in the Drake murder.  And even after he had told investigators about his involvement in the crime, he considered changing his story again.  On redirect, the

State asked McDonald if that was "because Benjamin Smiley is your cousin?" Following up, the State asked: "Do you want to see him in trouble?" McDonald responded: "No. He said that it—they was trying to give him the death penalty."

Smiley contends that, because this was a bifurcated trial and the guilt-phase jury was not death-qualified, this comment improperly alerted the jury to the possibility that Smiley would be eligible for and receive the death penalty if found guilty. Smiley argues that the trial court's denial of his request for a mistrial based on McDonald's statement is error that warrants a new trial.

We disagree. A fleeting, isolated comment like McDonald's here does not meet the high standard required for a mistrial. *See Fletcher v. State*, 168 So. 3d 186, 207 (Fla. 2015) ("A comment that is brief, isolated, and inadvertent may not warrant a mistrial."). We deny relief on this claim.

## V. Vouching for the Death Penalty

Smiley's next argument is about certain comments made by the prosecutor during the penalty phase voir dire. Because context is important for evaluating claims of this nature, we present the relevant exchange in some detail.

The prosecutor prefaced the comments at issue by observing that there are some people who feel "so strongly about first-degree murder that if someone commits first-degree murder there should be no question" that the death penalty should be imposed. Then, addressing a potential juror who earlier had described

himself as a strong proponent of the death penalty, the prosecutor asked: "Do you think that just because someone is convicted of first-degree murder it should be an automatic death sentence?" The juror started to answer the question, but the prosecutor interrupted, asking: "[D]o you understand that in Florida not every case meets the qualifications for a death penalty?" The prosecutor continued:

> We have, you know, 60 death—60 first-degree murder cases pending in our circuit. Okay? Probably nine of them are death eligible. So just because you're charged with first-degree murder does not mean that your case qualifies as a case that we would seek the death penalty in. Do you understand that?

In response, the juror indicated that he understood and answered "yes" when the prosecutor asked if he "agree[d] with that." The prosecutor then wrapped up by noting that the juror had said that he was a "strong proponent of the death penalty" and by asking: "In this case can you assure us you are going to listen to the law and hold the State to the burden that we have proved at least one aggravating factor beyond a reasonable doubt, you consider the mitigating circumstances before you would make a sentence of death?"

Defense counsel did not immediately object. The prosecutor then moved on to question the next potential juror, who also had earlier described herself as a strong death penalty proponent. Once again, the prosecutor began by asking if the juror believed in the automatic imposition of the death penalty as punishment for first-degree murder. The juror answered "no." Then the prosecutor continued:

"And do you understand that in the State of Florida that there are certain criteria that must be met before the State can even seek the death penalty?" After the juror answered, "I understand that now," the prosecutor said: "All right. So like I said, we have lots of cases but we don't—there are only cases that meet that—" At that point, defense counsel objected and asked to approach the bench.

Defense counsel explained that he anticipated that the prosecutor was going to repeat her comments about the number of pending murder cases in the circuit that are eligible for the death penalty. Defense counsel acknowledged: "I fear that I did not make a contemporaneous objection at that time." But counsel went on to argue that the prosecutor's comment was "very prejudicial" and counsel ultimately asked the trial court to strike the venire. The trial court sustained the objection to the prosecutor's comments but denied the request to strike the panel.

Smiley now argues that the denial of his motion to strike the venire was reversible error and that a new penalty phase is required. We review a decision of the trial court to deny a motion to strike the jury panel for abuse of discretion. *See Guzman v. State*, 238 So. 3d 146, 155 (Fla. 2018).

To support his argument, Smiley relies on *Pait v. State*, 112 So. 2d 380 (Fla. 1959), *Brooks v. State*, 762 So. 2d 879 (Fla. 2000), and *Ferrell v. State*, 29 So. 3d 959 (Fla. 2010). We discussed these same decisions in *Braddy v. State*, 111 So. 3d 810 (Fla. 2012). In *Braddy*, we described the earlier cases as ones where

prosecutors had violated the principle that "the State may not add legitimacy to its case by vouching for the death penalty during its closing argument." *Id.* at 847. We were careful to observe that, in *Pait*, *Brooks*, and *Ferrell*, "the prosecutors clearly appealed to the jurors to give weight to the fact that the State had decided to seek the death penalty." *Id.* We emphasized that the prosecutors' comments in those cases involved "a direct, unambiguous appeal" to the jury to give weight to the State's decision. *Id.*

Even assuming that precedents involving prosecutors' *closing arguments* apply in assessing comments made during voir dire, the comments at issue here do not violate the principle we described in *Braddy*. Viewing the prosecutor's statements in context, she was conveying the point that the law does not permit jurors to vote for the death penalty as an "automatic" punishment for first-degree murder. Just after making the disputed comment, the prosecutor in fact asked the juror for assurance that he could hold the State to its burden of proving an aggravating factor beyond a reasonable doubt. The prosecutor did not make an argument of any kind, much less a "direct, unambiguous appeal" for the potential jurors to give weight to the State's decision to seek the death penalty.

We do not condone the prosecutor's comments. The State can and should explain the concepts of death eligibility, aggravation, and mitigation without telling the jury that the government seeks the death penalty only in a subset of first-

degree murder cases. But the prosecutor's statements here fall far short of what would be required to justify striking the venire and starting over again, and the trial court did not abuse its discretion in denying Smiley's request. (In light of our resolution of this issue, we need not address the State's argument that Smiley did not lodge a contemporaneous objection and therefore waived this claim.) We deny this claim.

## VI.    Firearm Arguments During the Penalty Phase

Smiley next argues that the penalty phase jury heard evidence contrary to the guilt phase verdict and that this constitutes reversible error. Specifically, Smiley argues that the trial court should not have allowed the State to argue to the penalty phase jury that Smiley was the shooter in the Drake murder. Smiley bases this claim on the fact that, in counts 2 ("Robbery with a Firearm"), 4 ("Aggravated Assault with a Firearm"), and 5 ("Burglary of a Dwelling with an Assault or Battery While Armed with a Firearm"), the jury failed to mark spaces on the verdict form that would have allowed it to make special findings about Smiley's possession or discharge of a firearm during the commission of the crime charged in each of those counts. (Count 3, "Tampering with Physical Evidence," is not at issue because the jury found Smiley not guilty as to that count.)

This argument has no merit. The jury found Smiley guilty on count 1, "First Degree Felony Murder, as charged in the indictment." Count 1 of the indictment

explicitly alleged that Smiley killed Drake by shooting him with a firearm. Moreover, the trial court instructed the jury that, in order to convict Smiley on count 1, it would have to find proven beyond a reasonable doubt that Smiley "was the person who actually killed Clifford Drake." The jury's guilty verdict on this count thus reflects a clear finding that Smiley shot and killed Drake.

The jury's verdicts on counts 2, 4, and 5 also reflect findings that Smiley had a firearm during the Drake murder. In count 2, the jury found Smiley guilty of "Robbery with a Firearm, as charged in the indictment." In count 4, the jury found Smiley guilty of "Aggravated Assault with a Firearm, as charged in the indictment." And in count 5, the jury found Smiley guilty of "Burglary of a Dwelling with an Assault or Battery While Armed with a Firearm, as charged in the indictment."

Smiley invokes *Lebron v. State*, 894 So. 2d 849 (Fla. 2005), but that case does not help him. In *Lebron*, the jury found the defendant guilty of felony murder, but also "determined" that the murder victim was "actually shot by someone other than" the defendant. *Id*. at 852. We held that, at sentencing, the State could not present a police officer's testimony that "the investigation proved that Lebron shot the victim." *Id*. at 855. Such testimony would be impermissible, we held, because it would be "directly and precisely to the contrary of a specific factual finding by a prior jury." *Id*. at 854-55.

By contrast, the guilt phase jury in this case did not make a specific factual finding that someone other than Smiley shot Drake. On the contrary, by finding Smiley guilty on count 1, the jury found the opposite—that Smiley killed the victim. It is not clear why the jury chose not to make the special findings in counts 2, 4, and 5 as to Smiley's possession or discharge of a firearm. A question from the jury during its deliberations raises the possibility that the jury believed that the special findings on those other counts related only to Mark Wilkerson—not Clifford Drake—as a victim. The jury might have thought the special finding questions were redundant, since the guilty verdicts on counts 2, 4, and 5 explicitly included language to the effect that Smiley committed each offense "with a firearm." But we need not speculate about the jury's thinking. In contrast to the facts of *Lebron*, the verdict form in this case does not reflect any specific factual finding by the jury that Smiley was not the shooter. Therefore, we deny this claim.

## VII. Penalty Phase Closing Arguments

### A. The State's Comments

Smiley challenges a raft of statements by the prosecutor during the penalty phase closing argument, some of which were objected to but many of which were not. Objected-to comments are reviewed for harmless error, and unobjected-to comments for fundamental error. Fundamental error is error that reaches down into the validity of the trial itself to the extent that the jury's recommendation of

death could not have been obtained without the assistance of the alleged error. *Card v. State*, 803 So. 2d 613, 622 (Fla. 2001). In *Card*, another case involving a defendant's challenge to a mix of objected-to and unobjected-to statements from closing argument, we observed that we do not review challenged comments only in isolation. Rather, we consider the closing argument as a whole and determine whether the cumulative effect of any errors deprived the defendant of a fair penalty phase hearing. *Id.* Our review is framed by the background principle that "attorneys are generally afforded wide latitude while presenting closing statements to the jury." *Fletcher v. State*, 168 So. 3d 186, 213 (Fla. 2015).

Some aspects of this claim merely rehash arguments that we consider and reject elsewhere in this opinion. For example, there is no merit to Smiley's arguments that it was improper for the State to argue that Smiley was the shooter or, relatedly, that the State invited the jury to "rethink or ignore the determinations of the guilt phase jury." Nor, as we explain later, did the State's unobjected-to treatment of the prior violent felony aggravating factor fatally skew the jury's weighing of aggravators and mitigators.

Some of Smiley's arguments mischaracterize the prosecutor's statements or the law. For example, based on our review of the State's closing argument, there is no merit to Smiley's assertions that the State: denigrated Smiley's exercise of his right to a penalty phase jury trial; argued for an uncharged aggravating factor;

"obfuscated" relevant facts; or likened Smiley's actions to Jeffrey Dahmer's (the prosecution mentioned Dahmer only to make the point that the death penalty is not limited only to the most horrible murderers). Nor do we find any unfair prejudice in the prosecutor's unobjected-to statement that: "The death penalty, like any punishment, is a deterrent."

We also reject Smiley's claim that the State made an impermissible "golden rule" argument by saying that Smiley "has an utter disregard for not only . . . the security of your home, of Drake's home, of Ms. Riley's home, but also he has an utter disregard for the sanctity of human life." In contrast to the State's comment, prohibited golden rule arguments are ones that ask the jurors to put themselves in the victim's position and to imagine the victim's pain and terror. *See Allen v. State*, 261 So. 3d 1255, 1278 (Fla. 2019). The prosecutor here did not do that.

Similarly unavailing is Smiley's argument that the State erred by telling the jury that their decision "to impose the death penalty on Mr. Smiley cannot be based on sympathy for Mr. Smiley. And the law says so. . . . To base your decision on sympathy for this defendant would be to forget the person who lost his life innocently at the hands of this defendant." Our precedent establishes that it is permissible to tell the jury that it should not base its decision on sympathy for the defendant. *See Zack v. State*, 753 So. 2d 9, 23-24 (Fla. 2000).

Finally, we also are unpersuaded by Smiley's claim that the prosecution impermissibly misstated the law on mitigation, denigrated his mitigation evidence, or sought to treat Smiley's mitigating evidence as a nonstatutory aggravating factor. This claim centers on the State's attempt to anticipate Smiley's arguments about the effects of the brain aneurysms that Smiley suffered as a twenty-year-old, the year before the Drake and Riley murders. Among other things, the State said: "There's no dispute this defendant suffered a brain aneurysm. So what? People suffer brain aneurysms all the time . . . and they manage to go on with life without murdering people." The State rhetorically asked whether Smiley "should not be put to death simply because he suffered a brain aneurysm? I would submit to you that one has nothing to do with the other." And the State argued to the jury that, even prior to the aneurysm, Smiley had engaged in bad behavior: "the fights, the being kicked out of his home for not following the rules, the run-ins with the law, the smoking, the drinking, all of those things."

We rejected nearly identical arguments in *Fletcher v. State*, 168 So. 3d 186 (Fla. 2015). The defendant in that case faulted the prosecution for saying: "[T]he defendant has suffered from a chronic addiction to drugs in the past. I submit to you a lot of people have drug addictions. Most of them do not murder other people." *Id*. at 214. The prosecution in *Fletcher* also had said: "Now there's a lot of people who come from tough circumstances, abusive families, but they, too,

most of them, do not go and murder other people." *Id*. This Court found the comments permissible, reasoning that they were proper arguments going to the weight that the jury should assign to the asserted mitigation. *Id*. at 215. The Court contrasted statements like these with ones that simply characterized mitigation evidence as "invalid or excuses." *Id*. The logic of *Fletcher* defeats Smiley's claim that he was unfairly prejudiced by the comments at issue here.

Nor did the State improperly convert mitigation into an uncharged aggravating factor. Viewing the prosecution's comments in context, the State did not argue that the jury should punish Smiley for any pre-aneurysm misbehavior or treat Smiley's intelligence as an aggravating factor. Rather, the prosecution was making a valid argument—the persuasiveness of which was for the jury to decide—that the aneurysm could not explain Smiley's actions during the Drake murder and that, instead, Smiley's actions were knowing and deliberate.

In sum, we have carefully reviewed the State's entire closing argument in light of the allegedly improper comments identified by Smiley, and we find no error or collection of errors that warrants reversal for a new penalty phase.

### B. Defense Comments

Smiley next argues that defense counsel's own closing argument was so deficient that it constituted fundamental error or ineffective assistance of counsel.

We have reviewed defense counsel's argument, both on its own and together with the State 's closing argument, and we find no fundamental error.

Ineffective assistance of counsel claims usually are not cognizable on direct appeal. We have been willing to depart from this general rule in the rare situation where ineffectiveness (both performance and prejudice) is "indisputable from the face of the record before us." *Monroe v. State*, 191 So. 3d 395, 404 (Fla. 2016). The alleged inadequacies in defense counsel's argument in this case do not meet that demanding standard. Accordingly, we will not take up the merits of Smiley's ineffective assistance of counsel claim here.

## VIII. Penalty Phase Jury Instructions and Verdict Form

Smiley contends that reversible error occurred because the verdict form and the trial court's jury instructions allowed the jury to treat each of Smiley's five prior violent felony convictions as a separate aggravator. Specifically, the verdict form identified and listed each prior violent felony individually and asked the jury to record its vote on each. Smiley claims that this deviated from the verdict form and jury instructions that we approved in *In re Standard Jury Instructions in Capital Cases*, 214 So. 3d 1236 (Fla. 2017). Smiley further argues that this caused him prejudice by overstating the number of aggravators proven in his case. Because Smiley did not object to the verdict form or jury instructions, we evaluate this claim under the fundamental error standard. To constitute fundamental error,

an alleged error must reach down into the validity of the sentencing proceeding itself such that the sentence could not have been obtained without the assistance of the alleged error. *See, e.g.*, *Archer v. State*, 673 So. 2d 17, 20 (Fla. 1996).

There is nothing in the death penalty sentencing statute or in our case law that prohibits asking the jury to separately indicate its findings on any prior violent felony underlying the prior violent felony aggravator. Indeed, we have observed that in evaluating the weight of the prior violent felony aggravator, "the facts upon which the aggravator is based are critical to our analysis." *Bevel v. State*, 983 So. 2d 505, 524 (Fla. 2008). Voting separately on each underlying conviction also adds clarity to the jury's findings and could be helpful if any particular conviction is subsequently invalidated. We find no error in this regard.

But Smiley makes a separate argument that the presentation of Smiley's prior violent felonies in this case skewed the jury's weighing of aggravating factors and mitigating circumstances. Under our case law, "[i]f a defendant has multiple convictions for prior violent felonies, the trial court can find only a single aggravating circumstance, but it may give that circumstance greater weight based upon the existence of multiple convictions." *Bright v. State*, 90 So. 3d 249, 261 (Fla. 2012). Presumably this applies to the jury's findings and weighing calculus as well. Thus, even though a jury is entitled to weigh multiple prior violent felonies more heavily than a single violent felony, the jury instructions here were

erroneous to the extent they suggested that each prior violent felony conviction constituted a separate aggravating factor. Nonetheless, any error falls far short of the high bar for establishing fundamental error.

The aggravating factors here included Smiley's prior conviction for the Carmen Riley murder (a capital felony), a particularly weighty aggravator. The Drake episode involved contemporaneous felony convictions involving crimes against a separate victim. The verdict form shows that the jury found this to be a case involving very little mitigation. Indeed, the verdict form suggests that the jury unanimously rejected Smiley's principal argument in mitigation, that his ruptured aneurysms and resulting brain damage lessened his culpability. Finally, the trial court properly instructed the jury that the weighing process is not "mechanical or mathematical" and that the jury therefore "should not merely total the number of aggravating factors and compare that number to the total number of mitigating circumstances." Under these circumstances, we find no fundamental error.

We also see no merit in Smiley's challenge to the jury instructions and verdict form as they related to mitigating circumstances. Smiley bases this claim on alleged deviations from standard jury instructions approved *after* his sentencing

proceeding,[5] and he points to no independent authority to support his argument that the trial court committed reversible error.  We therefore deny this claim as well.

## IX.    Sentencing Order Deficiencies

Smiley argues that the trial court's sentencing order was deficient in several ways.  First, Smiley faults the trial court for not conducting an analysis under *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987).  Relatedly, Smiley claims that the trial court improperly relied on a finding that Smiley was the shooter.

As we explained in *Jackson v. State*, 575 So. 2d 181 (Fla. 1991), the Supreme Court's decisions in *Enmund* and *Tison* addressed the constitutionality, in multi-participant felony murder cases, of imposing a death sentence on someone other than the person who actually killed the victim.  We summarized those cases as standing for the proposition that "the death penalty may be proportional punishment if the evidence shows both that the defendant was a major participant in the crime, and that the defendant's state of mind amounted to reckless indifference to human life."  *Id*. at 191.  The *Enmund/Tison* rule has no bearing on this case.  As we have explained, the guilt phase jury found that Smiley killed Drake, and that finding is supported by competent, substantial evidence in the

---

5. Smiley cites the verdict form approved by this Court in 2018 in *In re Standard Criminal Jury Instructions in Capital Cases*, 244 So. 3d 172 (Fla. 2018).

record.  Therefore, there was no error in the trial court's failure to perform an *Enmund/Tison* analysis or in the trial court's finding that Smiley was the shooter in the Drake murder.

Smiley next contends that the trial court overcounted the number of aggravating factors proven in Smiley's case.  Smiley argues that, after performing the requisite merger analysis, the various aggravating factors should have been treated as two: the prior capital or violent felony aggravator, and the felony murder aggravator (murder "in the commission of" an enumerated felony).  In its sentencing order, the trial court instead grouped the aggravating factors in the following way: one combined aggravator for the two prior convictions involving the Riley murder; one combined aggravator for the prior convictions involving the robbery and assault of Mark Wilkerson and for the fact that the Drake murder was committed during the robbery of Wilkerson; one combined aggravator for the contemporaneous conviction for burglary with an assault or battery while armed and for the fact that the Drake murder was committed during a burglary; and one aggravator for the fact that the murder was committed for pecuniary gain.

We find that any error in the trial court's merger analysis was harmless.  As the trial court found, this was a highly aggravated murder, given both the contemporaneous crimes committed against Mark Wilkerson and, most importantly, Smiley's previous conviction for the Riley murder.  All of the facts

underlying the aggravating factors proven in this case—regardless of how those factors are grouped for merger purposes—were properly subject to consideration by the trial court. All of those facts would have added weight to whatever subset of aggravating factors remained at the conclusion of any different merger analysis. And balanced against this aggravation, the trial court found very little mitigation. Indeed, the trial court explicitly acknowledged that its balancing of aggravation and mitigation was qualitative not quantitative, and it found that "the nature and quality of the mitigation pales in comparison to the proven aggravating factors." Under these circumstances, we conclude that there is no reasonable possibility that, absent any error in the trial court's merger analysis, the court would have imposed a lesser sentence. *See, e.g.*, *Lukehart v. State*, 776 So. 2d 906, 925 (Fla. 2000) (applying harmless error analysis to claim of improper doubling of aggravating factors).

Finally, Smiley claims that the trial court failed to properly consider each proposed nonstatutory mitigating circumstance and that this requires resentencing. Smiley does not identify any particular nonstatutory mitigating circumstance that the trial court failed to consider. Instead, the claimed error goes to the form of the trial court's sentencing order. Smiley claims that the sentencing order is inadequate under the standards this Court established in *Campbell v. State*, 571 So. 2d 415 (Fla. 1990), *receded from in part by Trease v. State*, 768 So. 2d 1050, 1055

(Fla. 2000). We review alleged deficiencies in a sentencing order for harmless error. *See Mullens v. State*, 197 So. 3d 16, 30 (Fla. 2016).

The trial court's sentencing order introduces its analysis of Smiley's proposed mitigating circumstances saying: "The Court examined the evidence pertaining to the Defendant's life prior to the age of seventeen (when he left home), after he left his home, the reported brain aneurysm(s), and the Defendant's conduct after the brain injury." The Court then evaluated each of Smiley's proposed statutory mitigating circumstances in turn. However, when it got to the catch-all nonstatutory mitigating circumstances, the trial court addressed all of them in a single paragraph. The court wrote that it "examined the evidence presented through the testimony" of Smiley's mitigation witnesses, evaluated that testimony to consider "the matters related to the Defendant's character, background, life, and the circumstances of the offense," and "concluded that this circumstance should be accorded moderate weight." Earlier in its order, the trial court had summarized the testimony offered by each of Smiley's witnesses.

This Court has long reaffirmed *Campbell*'s requirement that the trial court's sentencing order must expressly evaluate each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and, in the

case of nonstatutory factors, whether it is truly of a mitigating nature.[6] A trial court may comply with this requirement by bundling proposed mitigating circumstances into categories of related conduct or issues and addressing them accordingly. In fact, we have encouraged trial courts to do so. *See Mullens*, 197 So. 3d at 30. And we allow trial courts to exercise their discretion to avoid repeatedly addressing proposed mitigating circumstances that are redundant. *See Foster v. State*, 778 So. 2d 906, 920 (Fla. 2000). Finally, in *Rogers v. State*, 285 So. 3d 872, 890 (Fla. 2019), we clarified that a trial court's written sentencing order need not "expressly articulate why the evidence presented warranted the allocation of a certain weight to a mitigating circumstance." Our precedents have aimed to avoid imposing on trial courts overly formalistic requirements, while at the same time ensuring that sentencing orders comply with the dictates of section 921.141(4), Florida Statutes (2019),[7] and contain enough specificity to enable meaningful appellate review.

---

6. *Campbell* also requires the trial court's order to: "(2) assign a weight to each aggravating factor and mitigating factor properly established; (3) weigh the established aggravating circumstances against the established mitigating circumstances; and (4) provide a detailed explanation of the result of the weighing process." *Rogers v. State*, 285 So. 3d 872, 889 (Fla. 2019) (quoting *Orme v. State*, 25 So. 3d 536, 547-48 (Fla. 2009)).

7. Section 921.141(4) requires the following:

In each case in which the court imposes a sentence of death, the court shall, considering the records of the trial and the sentencing

- 39 -

In this case, the trial court's sentencing order does not address Smiley's proposed nonstatutory mitigating circumstances with the specificity that *Campbell* and its progeny require. As we have suggested, the problem is not that the order fails to address the nonstatutory mitigators in exactly the format or order that Smiley proposed in his sentencing memorandum. Instead, the problem is that Smiley's proposed nonstatutory mitigators are not so substantively similar that they could be dealt with in a single, catch-all fashion. To give just a few examples: Smiley argued that his stepfather subjected him to overly harsh (though not abusive) corporal punishment; that Smiley himself has been a good father to his own son; that he persevered in his education and worked hard at his jobs; and that he has conducted himself well since his incarceration. None of this is to say that the trial court *had* to treat any of these circumstances as mitigating in Smiley's case or to assign them any particular weight. But Smiley's proposed mitigators are too substantively dissimilar from each other to be addressed as an undifferentiated whole.

---

proceedings, enter a written order addressing the aggravating factors set forth in subsection (6) found to exist, the mitigating circumstances in subsection (7) reasonably established by the evidence, whether there are sufficient aggravating factors to warrant the death penalty, and whether the aggravating factors outweigh the mitigating circumstances reasonably established by the evidence.

Nonetheless, because there is no reasonable possibility that Smiley would have received a lesser sentence absent the trial court's error, we conclude that the error was harmless. Smiley's previous conviction for the Riley capital felony and for the contemporaneous violent felonies committed against Mark Wilkerson made this a highly aggravated case. Moreover, the sentencing order leaves no doubt that the trial court was aware of and considered the nonstatutory mitigating circumstances that Smiley proposed. Significantly, the sentencing order shows that the trial court—like the penalty phase jury—was unpersuaded that Smiley's aneurysms and resulting brain injury constituted significant mitigation. The trial court found that Smiley had established the statutory mitigators for extreme mental or emotional disturbance and for substantially impaired ability to conform to the law, but the court still assigned each of these mitigators only "little weight." This was the heart of Smiley's case for mitigation, and the trial court was largely unmoved by it. On this record, there is no reasonable possibility that disaggregating Smiley's proposed nonstatutory mitigation—which the trial court assigned "moderate weight" in the aggregate—could have changed the trial court's weighing calculus and resulted in a life sentence.

## X.    Sufficiency of the Evidence

Although Smiley does not challenge the sufficiency of the evidence to sustain his conviction for first-degree felony murder, we must independently

review the record to determine whether competent, substantial evidence supports the conviction. *Kirkman v. State*, 233 So. 3d 456, 469 (Fla. 2018); Fla. R. App. P. 9.142(a)(5). That standard is easily satisfied here. The predicate felonies underlying the felony murder charge were robbery and burglary. Mark Wilkerson testified that Smiley shot and killed Drake and that Smiley stole Wilkerson's cell phone and forced his way into the Drake home. John McDonald testified that the criminal episode had the goal of stealing money from a safe in the Drake home and that Smiley confessed to the Drake murder. This testimony was corroborated by DNA evidence linking Smiley to the backpack found at the crime scene and by the cell phone records showing that Wilkerson's stolen phone was used in a three-way call with McDonald and Samantha Lee shortly after the murder. Competent, substantial evidence supports Smiley's first-degree felony murder conviction.

## XI. Proportionality of Smiley's Death Sentence

It has been this Court's practice in death sentence direct appeals to conduct a proportionality review to ensure that the defendant's crime falls within the most aggravated and least mitigated of murders. This review is qualitative, not quantitative—we do not simply tally the number of aggravating factors and mitigating circumstances. We accept the weight that the trial court has given to those factors and circumstances. And we consider the totality of the circumstances and compare the case with other capital cases.

Elsewhere in this opinion we have detailed the trial court's findings on aggravation and mitigation. Suffice it to say that the trial court gave great weight to Smiley's prior capital felony conviction for the Riley murder and to Smiley's contemporaneous convictions for the felonies Smiley committed against Mark Wilkerson. Moreover, though the trial court credited the fact that Smiley had suffered a severe brain trauma as a result of his ruptured aneurysms, the court gave little weight to Smiley's proposed mitigators for extreme emotional disturbance and inability to conform his conduct to the requirements of the law. Smiley's nonstatutory mitigating circumstances, which the trial court assigned moderate weight, were far from compelling. All in all, Smiley's felony murder conviction was highly aggravated—particularly because of his prior conviction for the Riley murder—and only lightly mitigated.

Recently, in *Newberry v. State*, 288 So. 3d 1040 (Fla. 2019), we upheld a death sentence imposed on a defendant who committed a robbery/murder and whose aggravators and mitigators were qualitatively similar to Smiley's. Our decision in *Newberry* cited multiple similar cases in which we upheld the imposition of a death sentence. *See id*. at 1049-50. Death is a proportionate punishment in Smiley's case.

In light of the foregoing, we affirm Smiley's conviction for first-degree felony murder and his sentence of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, and MUÑIZ, JJ., concur.
LABARGA, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Polk County,
        Jalal A. Harb, Judge - Case No. 532015CF004903A000XX

Andrea M. Norgard of Norgard, Norgard & Chastang, Bartow, Florida,

        for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Marilyn Muir Beccue, Senior Assistant Attorney General, Tampa, Florida,

        for Appellee